[No. H005648. Sixth Dist. Nov. 29, 1990.]

THOMAS GLAGE et al., Plaintiffs and Respondents, v.
HAWES FIREARMS COMPANY et al., Defendants and Appellants.

## COUNSEL

Robert G. Howie, Marer, Marer & Schuck, Gerald Z. Marer and John F. Schuck for Defendants and Appellants.

James F. McMillan and John Sargetis for Plaintiffs and Respondents.

## OPINION

CAPACCIOLI, Acting P. J.—

### Statement of the Case

Plaintiffs Thomas A. Glage (Glage) and his wife Helen Glage sued defendant Hawes Firearms Company (Hawes), for injuries to Glage allegedly caused by a revolver distributed by Hawes. The jury returned a verdict in

favor of plaintiffs. Hawes appeals from the judgment, claiming the trial court erred in denying its motion for a new trial based on juror misconduct. We agree and reverse the judgment.

## Injury, Evidence, and Verdict

On April 16, 1983, Glage was hunting wild boar when the .44 Magnum Hawes Western Marshall he was carrying in a holster unexpectedly discharged into his leg.

At trial, Glage sought to establish Hawes's liability by proving that the gun had a design defect, had been negligently manufactured, and did not come with adequate warnings concerning its dangerous propensities.

Hawes countered with evidence that perhaps Glage had failed to set the gun's safety and that if it properly had been set, a glancing blow to it would not have caused it to accidentally discharge. It also presented evidence that the gun had a reliable design, had not been negligently manufactured, and had been subsequently modified by someone else.

The jury found Hawes liable and awarded damages for Glage's injuries and his wife's loss of consortium.[1]

## Alleged Juror Misconduct

### Nondisclosures

During voir dire of the jury, the court and counsel explained that Glage and his wife sought to recover for personal injuries Glage suffered when the gun unexpectedly discharged. The court generally asked the jury panel and jury pool assembled in the courtroom to "keep in mind if there is anything that rings a bell or that the judge ought to know that or the attorneys ought to know that, you can tell us when you get up here." The court also asked, among other things, if anyone had "been in the position of having been injured and making a claim for injuries against anyone" or "had a close friend or family member who was injured and made a claim against anybody?"

Juror Donald Isaac informed the court that in 1972, he had received an insurance settlement after being injured in a traffic accident.

During opening argument, plaintiffs' counsel explained that Glage's injury required that pins be inserted into his leg, they needed constant cleaning, but that despite the cleaning, his wound became infected.

---

[1] The jury found Glage 25 percent negligent and the damages were reduced accordingly.

In an affidavit submitted after trial, Isaac declared, among other things, "In 1972, I sustained an injury in a motorcycle accident and as a result of that accident lost my left leg. Because my injury was similar to the plaintiff's, I discussed my experiences with my fellow jurors including my time in the hospital, pain and suffering, difficulties in adjustment, and my settlement. Specifically, I did discuss that fact that I had pins in my leg and a periodic (every four hours) medication routine. I also discussed that I had had gangrene in my leg."

In another affidavit, Juror John McPherson declared, "During deliberations on Friday, Juror Don Isaac told the jury about his accident in which he had lost his leg. He spoke about the pain he experienced. He stated it is probably more painful not to lose a leg. He also talked about his settlement."

During voir dire, Juror Roy Theiss said that he was in combat infantry during World War II. He said he had been trained to take guns apart and probably could still disassemble an M-I. He indicated there was nothing about his war experience and the fact that he now had commercial relations with the Japanese that made him uneasy.

In his affidavit, however, Juror Theiss declared that during the war, he had been wounded three times and still carried a bullet in his knee.

During voir dire, Juror Joann Harvey mentioned that she had a daughter but said nothing else about her. In her affidavit, she declared that in September 1987, her daughter was in an auto accident and suffered severe injuries which were not covered by insurance.

### Extraneous Information

In an affidavit, Juror Laurel Holmes declared, "Because there had been considerable discussion about the exact meaning of the word 'preponderance' as used in the jury instructions, on Friday morning before I came to court, I looked up the word in a dictionary. During deliberations on Friday morning, I discussed the definition that I had read with fellow jurors."

Juror John McPherson declared, "During the jury's deliberations, the jury voted first on Wednesday morning, and periodically throughout the next three days until a verdict was reached. The jury vote remained 8-4 or 7-4-1 for the defendant until Thursday evening. [¶] On Friday morning, juror Laurel Holmes told fellow jurors that she had consulted a dictionary to determine the precise meaning of the word 'preponderance' since there had been some discussion about its meaning among the jurors. She dis-

cussed the definition she had found with fellow jurors. The jury vote was 6-5-1 after that discussion. The jury then decided to prepare an itemized list of all of the evidence in chart form for each party. [¶] After lunch on Friday a vote was taken and yielded a 9-3 vote for liability."

Juror Don Isaac declared, "On Friday morning, one of the female jurors stated to the jury that she had looked up the word 'preponderance' in the dictionary the definition of which she then described to the jury and discussed with the jury. [¶] It was suggested that a chart be prepared and I assumed the role of draftsman of the chart. The purpose of the chart was to use a list to resolve the problem of preponderance of the evidence. When the list was made the plaintiff's list was longer than the defendant's."

Juror Edwardo Aguilera declared, "During jury deliberations, I looked up the definition of the word 'preponderance' in a dictionary because I did not believe I understood the meaning of the word. There had been discussion of the word as to its exact meaning by my fellow jurors and I wanted to know exactly what it meant. I did this prior to the list of evidence being prepared by the jury.

Juror Joann Harvey declared, "Juror Laurel Holmes indicated she looked up the word 'preponderance' and discussed the matter with us. Juror Holmes voted and argued for the plaintiff on all the votes taken."

### Discussion

Hawes contends the trial court erred in denying its motion for new trial due to juror misconduct. It claims that in failing to disclose relevant information about their or a family member's injuries, Jurors Isaac, Theiss, and Harvey concealed a likely source of bias and thus committed misconduct. Hawes claims that Juror Isaac compounded his misconduct by discussing his own medical problems and experience with the other jurors, thereby introducing extraneous evidence to the jury. Finally, Hawes claims that Jurors Holmes and Aguilera committed misconduct in looking up the dictionary definition of "preponderance" and discussing it with the other jurors.[2]

### The Law

A new trial may be granted where the substantial rights of a party are materially affected by misconduct or irregularity in the proceedings of

---

[2] The record does not reveal the actual dictionary definitions found by Holmes and Aguilera and/or discussed by the jury.

the jury. (Code Civ. Proc., § 657, subds. 1 and 2; *Tapia* v. *Barker* (1984) 160 Cal.App.3d 761, 765 [206 Cal.Rptr. 803].)

◼ In reviewing the *denial* of a motion for new trial based on jury misconduct, the appellate court must review the entire record, including the evidence, and determine independently whether the misconduct, if it occurred, prevented the complaining party from having a fair trial. (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417, fn. 10 [185 Cal.Rptr. 654, 650 P.2d 1171]; *Young* v. *Brunicardi* (1986) 187 Cal.App.3d 1344, 1348 [232 Cal.Rptr. 588]; *Clemens* v. *Regents of University of California* (1971) 20 Cal.App.3d 356, 366 [97 Cal.Rptr. 589]; see Cal. Const., art. VI, § 13.) Underlying our review is the party's constitutional right to a fair trial by 12 impartial jurors. (U.S. Const., 7th Amend.; Cal. Const., art. I, § 16; see *Hasson* v. *Ford Motor Co., supra*, 32 Cal.3d 388, 416; *Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 953 [182 Cal.Rptr. 176].)

◼ Once juror misconduct is established, a *presumption* of prejudice arises. (*Hasson* v. *Ford Motor Co., supra*, 32 Cal.3d 388, 416-417.) This presumption may be rebutted only by "an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Ibid.*; *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127].

◼ Recently, in *People* v. *Marshall* (1990) 50 Cal.3d 907 [269 Cal.Rptr. 269, 790 P.2d 676], the court articulated the standard to be applied in criminal cases to determine whether the presumption of prejudice has been rebutted: "A judgment adverse to a defendant in a criminal case must be reversed or vacated 'whenever . . . the court finds a substantial likelihood that the vote of *one* or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.'" (*Id.* at p. 950, italics added; see *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1109 [269 Cal.Rptr. 530, 790 P.2d 1327].)

As the court explained, "Any deficiency that undermines the integrity of a trial—which requires a proceeding at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury—introduces the taint of fundamental unfairness and calls for reversal without consideration of actual prejudice. [Citation.] Such a deficiency is threatened by jury misconduct. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to

conclude that the integrity of the trial was undermined: under such circumstances, we cannot conclude that the jury was impartial. By contrast, when the misconduct does not support such a finding, we must hold it nonprejudicial." (*People* v. *Marshall, supra,* 50 Cal.3d 906, 950-951.)

A strict rule that one tainted juror compels reversal is necessary in criminal cases because under the California Constitution, the jury must unanimously agree that a defendant is guilty.[3] (Cal. Const., art. I, § 16; see 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2631, pp. 3154-3156.) The vote of one tainted juror obviously renders the required unanimous verdict unreliable.

In civil cases, however, juror unanimity is not required. (Cal. Const., art. I, § 16.) Rather, "three-fourths of the jury may render a verdict." (*Ibid.*) Thus, the strict *Marshall* rule regarding one tainted juror is neither necessary nor appropriate.

Nevertheless, since civil litigants are no less entitled to a fair trial than criminal defendants (*Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d 388, 416), the *rationale* underlying the *Marshall* court's "substantial likelihood" test quoted above is equally applicable to civil cases. (Cf. *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d 388.)[4]

We further note that the *Marshall* court neither cited nor discussed its seminal and/or recent cases dealing with the proper analysis of juror misconduct, such as *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050], *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d 388, *People* v. *Miranda, supra,* 44 Cal.3d 57, or *People* v. *Karis* (1988) 46 Cal.3d 612 [250 Cal.Rptr. 659, 758 P.2d 1189]. We do not believe, therefore, that the *Marshall* court intended to overrule or even depart from the general analytical principles set forth in those cases. Rather, in our view, the court merely rearticulated those principles to clarify when juror misconduct requires reversal in criminal cases. Thus, we assume that in civil cases, where the court finds a "substantial likelihood" that enough jurors were impermissibly influenced by misconduct to have affected the verdict to the detriment of the complaining party, there is "reasonable probability of actual harm to the complaining party resulting from the

---

[3] The federal Constitution, however, does not require a unanimous jury verdict in criminal trials. (5 Witkin & Epstein, Cal. Criminal Law, *supra,* Trial, § 2635, pp. 3159-3161 and cases cited there.)

[4] In *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d 388, it was argued that the presumption of prejudice from juror misconduct arises only in criminal cases. The court rejected this claim, explaining that although the presumption developed in criminal cases, "civil litigants, like criminal defendants, have a constitutionally protected right to the complete consideration of their case by an impartial panel of jurors. [Citations.]" (*Id.* at p. 416.)

misconduct."[5] (*Hasson* v. *Ford Motor Co., supra*, 32 Cal.3d 388, 417.) Under such circumstances, the presumption of prejudice is not rebutted.

### Misconduct

■ It is well established that a juror's reference to a dictionary for the definition of a term used in an instruction constitutes misconduct. (*People* v. *Karis, supra,* 46 Cal.3d 612, 642-643; *People* v. *Harper* (1986) 186 Cal.App.3d 1420, 1426 [231 Cal.Rptr. 414]; *Jones* v. *Sieve* (1988) 203 Cal.App.3d 359, 366-367 [249 Cal.Rptr. 821].) In *People* v. *Karis, supra,* 46 Cal.3d 612, 642, the Supreme Court explained that "[u]se of a dictionary to obtain further understanding of the court's instructions poses a risk that the jury will misunderstand the meaning of terms which have a technical or unique usage in the law."

■ Here, the jury was specifically instructed not to consult reference works for additional information. And Glage concedes that Jurors Holmes and Aguilera committed misconduct by looking up the definition of "preponderance" and discussing it with all the jurors. Thus, the issue before us is whether the presumption of prejudice from this misconduct has been rebutted.

In opposing Hawes's motion for new trial, Glage did not offer counter-affidavits to rebut the presumption of prejudice.[6] Rather he argued that reference to a dictionary, though an irregularity, was not misconduct. He further claimed the jurors "found that the meaning did not vary in any significant fashion from the definition set forth in the instruction."

---

[5] Because, as noted above, unanimity is not required in civil cases, the number of tainted jurors needed to compel reversal will vary. For example, where a jury renders a unanimous verdict against the complaining party, evidence of only *one* impermissibly tainted juror does not compel reversal as in a criminal case because the remaining *untainted* jurors were sufficiently numerous to render a proper and fair verdict, and the record conclusively rebuts the presumption of prejudice.

However, evidence of only one tainted juror would not necessarily rebut the presumption where the jury's verdict is nine to three, unless that juror voted for the complaining party. (Cf. *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 [95 Cal.Rptr. 516, 485 P.2d 1132]; *Young* v. *Brunicardi, supra,* 187 Cal.App.3d 1344, 1351-1352; *Andrews* v. *County of Orange, supra,* 130 Cal.App.3d 944, 959; *Clemens* v. *Regents of University of California, supra,* 20 Cal.App.3d 356, 366-367.)

[6] We note that Glage also moved for a new trial on the ground, among others, that Juror Isaac concealed his prior injury during voir dire. However, Glage withdrew this particular claim after obtaining an affidavit from Isaac, in which he states he was not biased in favor of either party. In this affidavit, Isaac also states, "Earlier votes by myself during deliberations were for the defendant. [¶] Subsequent weighing of the evidence showed more preponderance in favor of the plaintiff based on jury instructions relative to evidence."

At the hearing on the motion, Glage argued that reading a dictionary definition of "preponderance" was not misconduct because the dictionary definition is so similar to the court's instruction. (See fn. 7, *post*, this page.)

On appeal, Glage reiterates these arguments. He claims that "a fair summary of the dictionary meanings . . . would be that preponderance means superiority in *weight, quantity, power, importance.* Thus, it is clear that the common meaning found in a dictionary does not differ in any significant respect from that provided to the jurors in the instructions. It is obvious that no harm was done in using the dictionary." (Italics in original.) We disagree.

■ "Some of the factors to be considered when determining whether the presumption [of prejudice] is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Hasson v. Ford Motor Co., supra*, 32 Cal.3d 388, 417; see, e.g., *People v. Marshall, supra*, 50 Cal.3d 907; *People v. Karis, supra*, 46 Cal.3d 612; *Young v. Brunicardi, supra*, 187 Cal.App.3d 1344.)

Here, the evidence of misconduct is strong and undisputed. Not only did two jurors consult dictionaries, but the jury as a whole discussed the dictionary definition of "preponderance."

■ The misconduct was also serious in nature. It introduced to the jury an extraneous common definition of a word that is part of a legal term of art: preponderance of the evidence, a term critical to the jury's proper application of Glage's burden of proof.

■ As the court properly instructed the jury, " 'Preponderance of the evidence means evidence that has more convincing force than that opposed to it.'"[7] (BAJI No. 2.60 (7th ed. 1986); *People v. Miller* (1916) 171 Cal. 649, 652 [154 P. 468]; see 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 157, pp. 135-136.)

The sole focus of the legal definition of "preponderance" in the phrase "preponderance of the evidence" is on the *quality* of the evidence. The

---

[7] The court specifically instructed the jury, " 'Preponderance of the evidence' means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to say that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it. [¶] You should consider all the evidence bearing upon every issue regardless of who produced it." (See BAJI No. 2.60 (7th ed. 1986).)

The court also instructed the jury that Glage had the burden to prove all elements of his various claims by a preponderance of the evidence.

*quantity* of evidence presented by each side is irrelevant. Indeed, the court specifically instructed the jury not to decide the case in favor of the side that produced the most *witnesses* but rather on the basis of "the convincing force of the evidence." (See BAJI, *supra*, No. 2.01.)

Long ago, in *People v. Miller, supra*, 171 Cal. 649, 652, our Supreme Court explained that "preponderance of the evidence" "means what it says, viz., that the evidence on one side outweighs, preponderates over, is more than, the evidence on the other side, *not necessarily in number of witnesses or quantity*, but in its effect on those to whom it is addressed." (Italics added.)[8]

 As noted above, we do not know the exact definitions of the word "preponderance" Holmes and Aguilera found and discussed with the rest of the jury. However, Glage candidly concedes, and we agree, that detached from the phrase "preponderance of the evidence," the common meaning of "preponderance" naturally includes, among other things, the notion of *greater quantity*. Every dictionary we consulted confirms that such a meaning is a standard part of the word's common definition.

For example, Webster's Third New International Dictionary (1981) defines "preponderance" as "a superiority in weight . . ."; "a superiority in power, influence, importance, or strength"; "*a superiority or excess in number or quantity*[.]" (*Id.* at p. 1791, italics added; cf. Webster's New Collegiate Dict. (9th ed. 1986) p. 929 [same].)

The American Heritage Dictionary (2d College ed. 1982) defines "preponderance," as "Superiority in weight, *quantity*, power, or importance." (*Id.* at p. 978, italics added.)

---

[8] Black's Law Dictionary likewise emphasizes that the legal meaning of "preponderance of the evidence" is *exclusively* concerned with persuasive value of the evidence and not simply sheer quantity: "[E]vidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. [Citation.] With respect to burden of proof in civil actions, means greater weight of evidence, or evidence which is more credible and convincing to the mind. That which best accords with reason and probability. The word 'preponderance' means something more than 'weight'; it denotes a superiority of weight, or outweighing. The words are not synonymous, but substantially different. There is generally a 'weight' of evidence on each side in case of contested facts. But juries cannot properly act upon the weight of evidence, in favor of the one having the *onus*, unless it overbear, in some degree the weight upon the other side. [¶] That amount of evidence necessary for the plaintiff to win in a civil case. It is that degree of proof which is more probable than not. [¶] Preponderance of evidence may not be determined by the number of witnesses, but by the greater weight of all evidence, which does not necessarily mean the greater number of witnesses, but opportunity for knowledge, information possessed, and manner of testifying determines the weight of testimony." (Black's Law Dict. (6th ed. 1990) p. 1182, italics in original; see Ballentine's Law Dict. (3d ed. 1969) p. 980; West's Legal Thesaurus/Dict. (1986) p. 595; 32A C.J.S., Evidence, § 1021, pp. 648-652; 30 Am.Jur.2d Evidence, § 1164, pp. 338-341.)

The Random House Dictionary of the English Language (2d ed. 1987) defines preponderance as "superiority in weight, force, *numbers*, etc." (*Id.* at p. 1527, italics added; cf. The Random House College Dict. (1980) p. 1047 [same].)

Even West's Legal Thesaurus/Dictionary, *supra*, which properly defines "preponderance of the evidence," separately defines "preponderance" as "A greater weight, *quantity*, or importance (a preponderance of the claims were incomplete). *Plurality*, prevalence, predominance, *bulk*, *more than otherwise*, *lion's share*, *profusion*, *greater number*, dominance, *surplus*." (*Id.* at p. 595, italics added.)

In light of the restricted legal meaning of "preponderance of the evidence," the *broader* scope of the common definition of "preponderance," and the jury's duty to use the former and not the latter, we find that the juror misconduct here created a clear and substantial risk that the jury might apply the burden of proof in a mechanical quantitative way rather than properly determine which evidence was most convincing.

Finally, the record amply supports a finding of a "substantial likelihood" the jury was improperly influenced by the extraneous dictionary definition to Hawes's detriment. (*People* v. *Marshall, supra,* 50 Cal.3d 907, 951.)

Juror Holmes stated there was "considerable discussion about the exact meaning of the word 'preponderance' as used in the jury instructions." This was confirmed by Jurors McPherson, Isaac, Harvey, and Aguilera. Holmes and Aguilera then looked up the common definition of the word. According to McPherson, Holmes said she did so to understand the "precise" meaning of the word. She then discussed it with the rest of the jurors.

Prior to their discussion, the jury had voted eight to four or seven to four to one for Hawes. *Immediately after* their discussion, Hawes support slipped to six to five to one. Then, the jury prepared a chart designed simply to list the evidence presented by each side. As Juror Isaac declared, "When the list was made the plaintiff's list was longer than the defendant's." Thereafter, the jury voted nine to three *against* Hawes.

Glage claims, "It is arguable whether the affidavits describe 'overt acts, objectively ascertainable' when the subject of the listing of the evidence is discussed." He argues that it is erroneous to assume that the jury simply added up the number of items on each list "as that is a conclusion based on an assumption attempting to reach the jurors' thinking processes." We disagree.

Evidence that (1) the jury discussed the meaning of the word "preponderance" *before* the alleged misconduct, (2) Holmes and Aguilera thereafter looked up the common definition, (3) Holmes discussed it with the rest of the jury, (4) they made a chart to list the evidence, and (5) their vote on the issue of Hawes's liability then changed substantially are all objectively verifiable acts and occurrences. They, in turn, strongly suggest that the jury might have reached a verdict simply by seeing who presented the most evidence. Such an approach is not a mental process but overt conduct, akin to drawing lots, rolling dice, or flipping a coin.

In sum, given "the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued," i.e., the "substantial likelihood" that the jurors were impermissibly influenced to Hawes's detriment (see *Hasson v. Ford Motor Co., supra,* 32 Cal.3d 388, 417; *People v. Marshall, supra,* 50 Cal.3d 907, 951), we conclude that neither Glage's arguments nor our review of the entire record rebuts the presumption that the misconduct was prejudicial to Hawes.

We are aware that in *People v. Karis, supra,* 46 Cal.3d 612, the court found no basis for prejudice in the jury's consideration of the dictionary definition of "mitigating." There, however, after noting the extraneous definition, the court explained that the dictionary definition may not have been "particularly helpful" to the jury's understanding of the instructions and the defendant offered "no persuasive argument to support a conclusion that the jury might have been misled." (*Id.* at pp. 644-645.)

Here, on the other hand, the record supports a finding that the dictionary definition of "preponderance," which includes a meaning not shared by the legal definition, might have helped resolve the jury's quandary over the meaning of the term as used in the instructions and led several jurors to reverse their initial view of Hawes' liability.

Furthermore, here the jury was given a legal definition of "preponderance of the evidence," whereas in *Karis* the jury was not given a legal definition of "mitigating" or "mitigating circumstance" with which the dictionary definition could directly conflict.

We have also considered *People v. Harper, supra,* 186 Cal.App.3d 1420, where the court found no prejudice from one juror's telling the others the dictionary definition of "murder." *Harper* is distinguishable, however, because there, other jurors immediately cautioned the offending juror that his definition could not be considered, the misconduct was then brought to the court's attention *before* the jury rendered a verdict, and the trial court

strongly admonished the jury to disregard this definition. (*Id.* at pp. 1426-1429.)

Glage also directs our attention to *Watson* v. *Los Angeles Transit Lines* (1958) 157 Cal.App.2d 112 [320 P.2d 890]. There, plaintiff submitted an affidavit in which a juror declared she had read to the others the dictionary definitions of "negligent" and "prudent." At that time, however, a juror could impeach the verdict by affidavit only where the verdict was reached by chance or lot or where the affidavit established that bias or prejudice existed but had been concealed during voir dire. Thus, the the juror's affidavit failed to show any misconduct. (*Id.* at p. 116.) The appellate court further observed that in any event no prejudice had been shown because the the verdict was ten to two and this particular juror was one of the two dissenting votes. (*Ibid.*)

Here, by contrast, the misconduct is undisputed, and there was a dramatic shift in votes against Hawes after discussion of the dictionary definition.

Glage next cites *Gorman* v. *Leftwich* (1990) 218 Cal.App.3d 141 [266 Cal.Rptr. 671], for the proposition that reversal for misconduct is not required here because there is no evidence the jurors affirmatively agreed to disregard the court's instructions.

In *Gorman*, the defendant submitted affidavits to show that no vote was taken on the issue of causation. We observed that affidavits may not be used to to show that the jury made no findings as to certain matters. (*Gorman* v. *Leftwich, supra*, 218 Cal.App.3d 141, 146.) We then stated, "[I]t is when jurors affirmatively agree to disregard instruction that misconduct occurs." (*Id.* at p. 146.) Nothing in our opinion, however, suggests that such an agreement must be shown to demonstrate misconduct or prejudice.

We also find some merit in Hawes's argument that to the degree the jury considered the extraneous dictionary definition of "preponderance" in reaching the verdict, they implicitly agreed to disregard the court's explicit instruction not to consult outside reference material.

Finally, Glage claims this case is analogous to *Akers* v. *Kelley Co.* (1985) 173 Cal.App.3d 633 [219 Cal.Rptr. 513]. Not so.

*Akers* did not involve undisputed misconduct based on discussion of a dictionary definition of an important term in the jury instructions. Rather, *Akers* involved a "mixed bag" affidavit that related subjective impressions, conclusions, statements and opinions by other jurors, and discussion by the jury about an award in another case. *Akers* is readily distinguishable.

Since, we find that the presumption of prejudice has not been rebutted, we conclude that the misconduct resulted in an unfair trial. Therefore we hold that the trial court erred in denying Hawes's motion for a new trial.[9] (*Clemens* v. *Regents of University of California, supra*, 20 Cal.App.3d 356, 367.)

### Disposition

The judgment is reversed. Hawes is entitled to its costs on appeal. (Cal. Rules of Court, rule 26(a).)

Elia, J., and Bamattre-Manoukian, J., concurred.

---

[9] In light of our discussion, we need not address Hawes's additional claims of juror misconduct.