[No. B107706. Second Dist., Div. Two. Apr. 8, 1999.]

RICHARD McDONALD, Plaintiff and Appellant, v.
SOUTHERN PACIFIC TRANSPORTATION COMPANY, Defendant and
Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 2 of the Discussion.

---

**COUNSEL**

Engstrom, Lipscomb & Lack, Walter J. Lack, Jerry A. Ramsey and Daniel G. Whalen for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, Joseph P. Mascovich, Benjamin G. Shatz; Steptoe & Johnson and Lawrence P. Riff for Defendant and Respondent.

## OPINION

**MALLANO, J.**[*]—Plaintiff Richard McDonald appeals from a judgment on special verdict in favor of defendant Southern Pacific Transportation Company, and from an order denying his motion for judgment notwithstanding the verdict, in a suit for personal injuries under the Federal Employers' Liability Act (45 U.S.C. § 51 et seq.; FELA).[1] He contends that the evidence was insufficient to support the verdict, and that a new trial is in any event required because of prejudicial jury misconduct. We conclude that the showing of misconduct requires a new trial, but that the evidence did not warrant grant of judgment notwithstanding the verdict.

### FACTS

The accident that gave rise to this action occurred on the morning of October 21, 1991, at defendant's Los Angeles intermodal container transfer yard (yard), at which cargo containers are transferred between trailer trucks and railcars. Plaintiff was employed by defendant as a brakeman, working with Engineer Edward Fitzgerald and Conductor Victor Brown in assembling a freight train by backing ("shoving") a group or "cut" of railroad cars from an adjacent yard. Fitzgerald ran the locomotive that shoved the cars, while plaintiff and Brown operated pickup trucks in the yard. The three maintained contact by radio. Fitzgerald's radio was mounted in the locomotive. Plaintiff carried his suspended on his chest by a neck strap.

Plaintiff's immediate assignment was to guard or "protect" a grade crossing (J-crossing), frequently traversed by trucks, and over which the railcars would pass after proceeding from a curve through an underpass 462 feet away. The crossing was not equipped with gates or signals. It had "stop" indicators painted on the pavement, and plaintiff's truck was equipped with flashing red lights. Because Fitzgerald could not see ahead of the cars he was shoving, plaintiff served as his "eyes" at the crossing, assuring it was clear of traffic until the railcars entered it.

As was common practice, plaintiff stopped his truck on the track at the J-crossing to obtain the earliest possible view of the railcars as they emerged

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]The notice of appeal also refers to the order denying plaintiff's motion for new trial. Although reviewable on appeal from the judgment, that order is not independently appealable.

from the underpass. After Conductor Brown radioed that he had thrown a switch necessary for the shove to proceed, plaintiff informed Brown and Fitzgerald by radio that he was at the J-crossing, protecting it, and that the shove, along track 812, could proceed.[2] Brown then said, "Okay. Back up." Fitzgerald began the shove, attaining a speed of about eight miles per hour.

Plaintiff then received a broadcast from Fitzgerald that locomotives for a long-haul train ("road power") were coming out of the roundhouse, which would mean that a switch would have to be realigned to enable the crew's next scheduled operation. Plaintiff accordingly sought to contact the crew of the "road power," to request that they throw the switch after passing it. To do this, plaintiff turned his head downward to switch the radio from his "yard" frequency to a "road" channel, activate the talk button, and speak into the microphone.

It took plaintiff three attempts to complete the call. He then looked up toward the underpass, and saw the shoved cars coming toward him. Plaintiff "hit the gas" on his truck, but the engine died and the truck did not move. He then attempted to radio Fitzgerald to stop the train, twice stating, "That'll do" (railroad jargon for "stop"). Fitzgerald, however, did not receive this transmission, because plaintiff's radio was still switched to the road channel. The cut of railcars crashed into plaintiff's truck, crushing it and dragging it several hundred feet.[3] Plaintiff was not extracted from the wreckage for more than an hour. He suffered disabling leg and hand injuries.

At trial, plaintiff asserted several theories of defendant's negligence, causative of his injuries.[4] Among these was that defendant had provided an unsafe workplace by placing plaintiff on the tracks to guard the J-crossing, a condition that could have been obviated by maintaining crossing gates there.[5]

In this connection, rule 103 of defendant's general code of operating rules provided that "When cars are shoved . . . over road crossings at grade, a

---

[2]According to Fitzgerald, plaintiff in essence stated, "I'm at 'J' crossing. We're protected. We're shoving 812 . . . shove."

[3]Fitzgerald did not become aware of the crash until a yard operator radioed him to stop.

[4]Under the FELA, liability is established if the employer's negligence played any part in causing the employee's injury. (See *Waller* v. *Southern Pacific Co.* (1967) 66 Cal.2d 201, 212-213 [57 Cal.Rptr. 353, 424 P.2d 937].)

[5]In addition, plaintiff contended that defendant had provided unsafe equipment, namely the truck and the radio, and that Fitzgerald and Brown had shoved the cars in violation of several provisions of defendant's general code of operating rules. We review the evidence regarding these contentions in our discussion of plaintiff's appeal from the denial of judgment notwithstanding the verdict.

crew member must be in position on the ground at the crossing to warn traffic until it is occupied," but that "Such warning is not required when: [¶] (1) Crossing gates are in fully lowered position . . . ." The testimony repeatedly reflected that defendant had not placed crossing gates at the J-crossing. Testifying under Evidence Code section 776, Paul Earls, defendant's yard trainmaster (crew and rules supervisor) on the day of the accident, could provide no reasons why defendant had not done so, except to state that he had not seen crossing gates "inside of a plant like that where it's solely operated by Southern Pacific employees." Earls further testified that as of the time of the accident, roughly 10 to 18 movements of trains over the J-crossing occurred during each 24-hour shift. He then was asked, assuming crossing arms had been present, "In the average 24 hours, there would be 10 to 18 occasions when those crossing arms would have to lower to protect the 'J' crossing; right?" Earls replied, "That's correct."[6] Defendant offered no contradictory (or any other) evidence regarding the frequency with which gates at the J-crossing would be lowered during normal yard operation.

In his summation, plaintiff's counsel stressed Earls's testimony in connection with his argument that crossing gates or signals would have made safer the conditions under which plaintiff was required to protect the crossing.[7] In reply, defendant's counsel urged that defendant's method of guarding the crossing had been reasonable, and noted that plaintiff had not called any expert to testify that crossing gates were necessary or advisable. Commencing his rebuttal, plaintiff's counsel again argued: "I'm still waiting. I didn't hear one word in explanation. Southern Pacific is definitely silent on why . . . don't you people put a guard gate up at that crossing at 'J'? You would only have to move it 10 to 18 times every 24 hours."

The case was submitted to the jury on a special verdict, requiring it first to determine whether defendant had been negligent and then, if so, to decide issues of causation, comparative negligence, and damages. By a vote of nine to three, the jury found that defendant had not been negligent. Judgment for defendant accordingly was entered.

Plaintiff moved for judgment notwithstanding the verdict or for a new trial. Both motions asserted insufficiency of the evidence to support the

---

[6]Earls testified that the same would be true for flashing signals, or a combination of gates and signals.

[7]Counsel argued in part: "Better yet, where are the crossing arms? Remember the testimony from the train master, Mr. Earls? Ten to 18 trains over a 24 hour period. Less than one time per hour in a given workday. Less than one time per hour. If they had crossing gates here with those, those crossing gates would have to come down less than one time an hour on the average. . . . [¶] . . . How about that? Then Mr. McDonald wouldn't have to be sitting on the tracks. He could be on the point. He can be riding the point [the front of the railcars]."

verdict. (See Code Civ. Proc., §§ 629, 657, subd. 6.) In addition, the motion for new trial cited jury misconduct. (Code Civ. Proc., § 657, subd. 2.) In that connection, plaintiff tendered the declaration of Prentice Brown, one of the three jurors who had dissented from the verdict.

Among other things, Brown's declaration related certain statements and conduct by another juror, Fred Silverman, during the jury's deliberations. On voir dire, Silverman had identified himself as a career transportation consultant who did "some work, mainly with public agencies, but very often involving railroad operations, mainly grade crossings . . . ." On questioning by plaintiff's counsel, he stated that he had driven through the yard in connection with property acquisition, and that "there are other places, not in yards, where I have looked at line sections and grade crossings, grade crossing problems." Silverman stated he had not done any work regarding grade crossing safety or equipment design, nor had he had such training, but he was "aware of devices, aware of regulations, et cetera."

According to Brown's declaration, during deliberations another juror, Hobson, who also ultimately voted for plaintiff, had broached the issue of whether defendant should have installed crossing arms at the J-crossing. Silverman then had "stood up and said, 'No, that's totally wrong because you've got trains sitting on that track,' and he drew a diagram on the blackboard where [defendant] in his opinion would place these sensors, and he offered the suggestion, 'If they place these sensors here, because this is a rail yard, there would be cars sitting on the tracks all the time and the arms would be down all the time because there are cars just sitting there waiting to be picked up.' He said, 'This is the reason why the arms weren't installed.' " As Brown added, there had been no evidence introduced about sensors controlling crossing gates.

In response to Brown's declaration, defendant offered declarations by three other jurors. All of them confirmed Brown's account to some extent, and none contradicted it. Silverman himself declared that after Juror Hobson opined that gates should have been present, "I indicated to Mr. Hobson that the sensors which operated crossing gates would make it impractical to have gates at the location of the accident, because they would be triggered all day long." Silverman also stated that he did not recall who had first used the term "sensors" in the deliberations, but that the "discussion" of them had lasted "five minutes at the most." Juror Janice Moore similarly declared that Silverman had "explained that sensors at that location would be triggering all day and it would not make sense to have them there. The entire issue of sensors was only discussed for approximately three to four minutes during

the jury deliberations." Foreperson Michael Weidlein also declared that sensors had been discussed for a few minutes in relation to the use of crossing gates.

The trial court denied the motions for new trial and judgment notwithstanding the verdict.

DISCUSSION

1. *Jury Misconduct.*

We consider first plaintiff's contention that the trial court abused its discretion in denying the motion for new trial on grounds of prejudicial jury misconduct. The misconduct asserted consisted of Juror Silverman's opining to the jury regarding the absence and feasibility of crossing arms or gates at the J-crossing.

As noted, the evidence of Juror Silverman's conduct was uncontradicted. Moreover, it was clearly admissible. All of the declaration testimony set forth above related statements and conduct occurring during deliberations, as distinguished from asserted or attempted proof of the mental processes of the jury. (Evid. Code, § 1150, subd. (a).)

Presentation to or reception by a jury of new evidence from sources outside the trial evidence constitutes misconduct. (7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 338, pp. 382-383, and cases there cited.) This includes expert opinions about issues in the case that are not based on the evidence. As the Supreme Court has explained, "It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct." (*In re Malone* (1996) 12 Cal.4th 935, 963 [50 Cal.Rptr.2d 281, 911 P.2d 468].)

Juror Silverman's comments to the jury, in the nature of an expert opinion concerning the placement of crossing gate "sensors," their operation, and the consequent reason why gates had not been or could not be installed at the J-crossing, constituted misconduct under the foregoing rules. Speaking with the authority of a professional transportation consultant, Silverman

interjected the subject of "sensors," on which there had been no evidence at trial. He also expounded, and apparently illustrated with a diagram, his opinions about where such sensors would be placed to operate crossing gates for the J-crossing, how yard operations would activate those sensors, and consequently that gates would be infeasible to protect the crossing because they would continually block it.

This exposition went far beyond the evidence in the case. Silverman contradicted the testimony of defendant's own trainmaster, Earls, with respect to the frequency with which crossing gates would have been lowered, and also offered a rationale for the absence of gates, which Earls had been unable to provide. (Cf. *Wagner* v. *Doulton* (1980) 112 Cal.App.3d 945, 947, 949-951 [169 Cal.Rptr. 550] [not misconduct for engineer juror to draw diagram of accident location based solely on his impression of the testimony].) Silverman's opinion not only derived from sources outside the evidence, but also rebutted a significant element of plaintiff's proof, which was otherwise undisputed. It was clearly misconduct. (*In re Malone, supra,* 12 Cal.4th at p. 963; see *Wagner, supra,* at pp. 949-950.)

Defendant contends that Silverman's statements should be considered permissible inasmuch as "plaintiff never presented evidence to support his crossing gates argument," instead leaving its determination to the jury's common experience. This is an inaccurate characterization. First, plaintiff did present evidence that his workplace involved a crossing at which there were no gates, and which he was instead required to "protect" by placing himself on the tracks in his truck. Moreover, plaintiff presented specific evidence, through Earls, about the very point that Silverman later rebutted, namely the frequency with which crossing gates would have to operate had they been present at the J-crossing, and thus the practicality of that alternative. No more was required for the jury to reach a conclusion of negligence by failure to provide a safe work place.[8]

Furthermore, contrary to defendant's implication, Silverman's statements were not matters of common experience. They involved his own opinions about where "sensors" for the J-crossing gates would be placed and how the traffic in the yard would cause them to operate. The trial evidence about the operation of gates was limited to Earls's testimony as to the frequency with which they would be lowered. It made no reference to "sensors" (or other

---

[8]It is apparently defendant's view that plaintiff could not establish negligence in failing to maintain crossing gates at the J-crossing without expert testimony regarding their necessity, appropriateness, or efficacity there. That is not so. As the jury was instructed, in this case the issue of negligence was one of ordinary care by a reasonable person. That determination could be made by reference to the facts and circumstances of the situation.

means of control) or their placement. Silverman's embellishment of this state of the evidence brought to bear not common knowledge but purported expert (and ex parte) rebuttal.

Defendant also cites *Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 742 [223 Cal.Rptr. 859], in which the court termed it "inappropriate" for the defendant to complain about a juror's having disclosed her own pain and suffering during deliberations, when the defendant had not sought on voir dire to eliminate jurors with such experiences. Defendant suggests that having accepted Silverman as a juror with knowledge of his background, plaintiff should not be heard to complain of his use of it in deliberations. We find the analogy unacceptable. Plaintiff did explore Silverman's background on voir dire, but his answers neither disclosed nor intimated that he would later be moved to interject opinions based on sources outside the trial evidence, in contradiction of it. (Cf. *Smith* v. *Covell* (1980) 100 Cal.App.3d 947, 952 [161 Cal.Rptr. 377].)[9] Although voir dire is the primary vehicle for searching out bias in prospective jurors, it cannot clairvoyantly anticipate misconduct.

 The remaining question is whether the misconduct was prejudicial, so as to have required a grant of a new trial. "Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]" (*People* v. *Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87].) A showing of misconduct creates a presumption of prejudice, which in turn "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. [Citations.] Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 417 [185 Cal.Rptr. 654, 650 P.2d 1171], fn. omitted.)

More recently, the Supreme Court has stated that in criminal cases reversal is required "[w]hen the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment." (*People* v. *Marshall* (1990) 50

---

[9]The court in *Moore* also stated that its own conclusion "would of course be different had the foreperson on voir dire denied any personal feelings relative to this issue." (178 Cal.App.3d at p. 742.)

Cal.3d 907, 951 [269 Cal.Rptr. 269, 790 P.2d 676]; accord, *In re Malone, supra,* 12 Cal.4th at p. 964.) The test is an objective one, calling for inquiry as to whether the misconduct " 'is inherently likely to have influenced the juror.' " (*People* v. *Marshall, supra,* at p. 951.) This analysis of prejudice "is different from, and indeed less tolerant than," normal harmless error analysis, because jury misconduct threatens the structural integrity of the trial. (*Ibid.*) Although stated in criminal cases, this rationale applies to civil cases as well, because civil litigants too are constitutionally entitled to a fair trial before an unbiased jury. (*Province* v. *Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1679 [25 Cal.Rptr.2d 667], disapproved on another point in *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 41 [32 Cal.Rptr.2d 200, 876 P.2d 999]; *Glage* v. *Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 322 [276 Cal.Rptr. 430].) Moreover, a substantial likelihood that one juror was adversely affected would also require reversal in a civil case, like the present one, in which the verdict was nine to three. (See *Province, supra,* at p. 1680; *Glage, supra,* at p. 323, fn. 5.)

 We have previously reviewed the evidence of misconduct in this case. It is clear and undisputed. Moreover, we cannot agree with defendant's characterization of the episode as "trivial." Juror Silverman's exposition and demonstration may have been relatively brief, but they directly contradicted the trial evidence concerning a significant element of plaintiff's theory of unsafe workplace: the feasibility of crossing arms at the J-crossing. The thrust of Silverman's illustrated remarks, as attested to by himself as well as other jurors, was that plaintiff's theory of how due care could have made his workplace safer was extrinsically unrealistic, impractical, and worthy of dismissal.

Defendant contends that the misconduct could not have harmed plaintiff because this theory was unsupported by evidence. The premise of the argument remains inaccurate. (See fn. 8, *ante.*) Defendant further argues that because, according to Juror Brown's declaration, the jurors had already tentatively aligned nine to three in defendant's favor when Juror Silverman addressed them, it is unlikely that his comments had any impact. We cannot be so confident. In the first place, Brown's declaration was ambiguous as to the sequence and firmness of the jury's divisions in relation to when Silverman spoke. In any event, as described Silverman's remarks were strong and pertinent. They inherently carried a substantial probability of impact and influence. (See *People* v. *Marshall, supra,* 50 Cal.3d at p. 951.)

We conclude that the presumption of prejudice has not been rebutted. The misconduct was clear and severe, and it directly devalued the otherwise

undisputed evidence on a significant aspect of plaintiff's theory of the case regarding an unsafe workplace. In light of the entire record, as well as the closeness of the verdict, we believe that there is a substantial likelihood that plaintiff was thereby harmed. (See *People* v. *Marshall, supra,* 50 Cal.3d at pp. 950- 951; *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d at p. 417.) The trial court should have granted plaintiff's motion for new trial on grounds of jury misconduct.

2. *The Motion for Judgment Notwithstanding the Verdict.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed. The order denying motion for judgment notwithstanding the verdict is affirmed. Plaintiff shall recover costs.

Boren, P. J., and Nott, J., concurred.

---

*See footnote, *ante,* page 256.