Filed 7/23/21  Lasarte v. Catalina Cylinders CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JUAN LASARTE et al., | B295059 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC514465) |
| v. | |
| CATALINA CYLINDERS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge.  Affirmed.

Horvitz & Levy, Daniel J. Gonzalez, Mitchell C. Tilner; Bassi, Edlin, Huie & Blum, Fred M. Blum, Michael E. Gallagher, Jr., and Lisa M. Stevenson for Defendant and Appellant.

Balaban & Spielberger, Daniel K. Balaban, Andrew J. Spielberger; Esner, Chang & Boyer, Holly N. Boyer, Shea S. Murphy; Greene, Broillet & Wheeler and Browne Greene for Plaintiffs and Respondents.

_____

Catalina Cylinders appeals from an order granting in part the motion for new trial filed by the heirs of Roberto Jesus Lasarte and by Roberto's brother, Juan Lasarte, as to their strict liability failure to warn cause of action following a jury verdict in favor of Catalina.[1]  Roberto was killed, and Juan was seriously injured when a cylinder, manufactured by Catalina to hold compressed carbon dioxide, was filled with compressed nitrous oxide by Roberto and exploded at Roberto's place of business. The jury found Catalina was not negligent and had not failed adequately to warn of the dangers of filling a cylinder designed for carbon dioxide with nitrous oxide.  Plaintiffs moved for a new trial based on attorney and juror misconduct relating to admission of evidence of a settlement entered into between plaintiffs and former codefendant Rotarex North America, which manufactured the valve that controlled the filling of the cylinder. The trial court found both attorney and juror misconduct had occurred and the misconduct was prejudicial as to plaintiffs' failure to warn cause of action, but not their negligence cause of action.

On appeal, Catalina contends the jury's findings on the special verdict form that Catalina had not failed adequately to warn rebutted any presumption of prejudice from the attorney and juror misconduct because the jury would not have considered the conduct of Rotarex in deciding whether Catalina's warnings were adequate.  Applying a deferential abuse of discretion standard, we affirm.

---

[1]     To avoid confusion, we refer to Roberto and Juan by their first names.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Complaints*

On July 9, 2013 Juan filed a complaint alleging causes of action for negligence and strict products liability against Catalina and others.  On August 21, 2013 Roberto's children, Isabella Angeline and Roberto Angel Lasarte, and Roberto's parents, Maria and Roberto Manuel Lasarte, filed a complaint alleging wrongful death causes of action for negligence and strict products liability against Catalina and others.

On July 8, 2015 the plaintiffs amended their respective complaints to name Rotarex as a defendant.  The cases were consolidated for trial.

B.    *Plaintiffs' Motion in Limine*

Before trial, plaintiffs filed a motion in limine to exclude evidence of a prior settlement with Rotarex.  Catalina opposed the motion, arguing evidence of the settlement was admissible to impeach the credibility of plaintiffs' expert witnesses "about how they changed their testimony concerning the cause of the accident" after the settlement.  The trial court granted plaintiffs' motion in part, allowing Catalina to use evidence of the settlement only "to impeach expert witnesses who have changed their opinions if they offer evidence concerning why they changed their opinion."

C.    *Testimony at Trial*

1.    *The explosion and warning label*

On June 13, 2012 Juan and Roberto were at Noswerks, a business owned by Roberto.  Roberto sold performance auto parts

3

and serviced cylinders provided by his customers by refilling the cylinders with nitrous oxide for auto racing. On that day, Roberto asked Juan to hand him something. Then there was an explosion, which killed Roberto and seriously injured Juan. Juan woke up in the hospital and did not recall what had happened. The last thing Juan remembered was Roberto saying to him, "'[C]an you hand me that[?]'" Juan did not know whether Roberto was filling a cylinder with nitrous oxide when the explosion occurred.

Catalina manufactured and sold the cylinder that exploded, which was intended to be filled with carbon dioxide for use with carbonated beer and soda. The cylinder was equipped with a Rotarex "high-flow tank" valve that was used to transfer nitrous oxide from an external tank into the cylinder. The Rotarex valve contained a "rupture disc," which is a small piece of metal that is designed to rupture before the tank explodes. The cylinder was labeled "B20," which was intended to denote that it was a "beverage cylinder." Affixed to the cylinder was the following warning label: "A liquefied gas cylinder can be dangerous. Improper valve installation, filling, transporting, use, storage, maintenance, inspection, retesting, and disposal may result in cylinder failure, property damage, personal injury and/or death. Keep out of reach of children. . . . Never fill a condemned cylinder, a cylinder of questionable integrity, a cylinder requiring retesting, or a cylinder designed for another service. . . . Use only by trained professionals and designated charge, in a safe environment, and when in retest intervals."

Catalina also manufactures cylinders to hold nitrous oxide for use in auto racing. Catalina's carbon dioxide and nitrous oxide cylinders have the same general appearance; both are made

4

from aluminum in the same size and shape. Catalina manufactures its carbon dioxide and nitrous oxide cylinders in the same way, using "cutting oil" in the process that can leave hydrocarbon residue in the cylinder. After the manufacturing process, Catalina cleans the cylinders. Catalina then uses a third-party service to test its nitrous oxide cylinders for remaining hydrocarbon, but it does not test the carbon dioxide cylinders. Catalina sells only empty cylinders and does not sell any gas.

Plaintiffs' expert Dr. David Lenorovitz testified it was hazardous to use Catalina's carbon dioxide cylinder to hold nitrous oxide and the label on the carbon dioxide cylinder that exploded did not effectively communicate the hazard, especially given that the warning contained many words in a small area.

### 2. *The testimony of Drs. Romig and Stevick*

Dr. Joe Romig testified for plaintiffs as an expert in astrophysics and geophysics. He opined compressed nitrous oxide can react with hydrocarbon, creating a combustion reaction and releasing energy. High pressure of 3,600 to 4,000 pounds per square inch would have caused the cylinder that exploded to rupture. Although the cylinder was equipped with a valve containing a rupture disc designed to burst at 3,000 pounds per square inch of pressure, thereby relieving the excessive pressure, the disc did not "pop." Dr. Romig believed this could have been due to the rapid rate at which the pressure rose in the cylinder, which could have caused the cylinder to explode before the disc ruptured.

Dr. Romig gave plaintiffs' counsel his initial opinion in February 2016 that an internal explosion in the cylinder caused

5

the accident, but he was not asked to perform further work on the subject until March 2018.  On cross-examination, Catalina's attorney, Fred Blum, asked Dr. Romig whether he was told before February 2016 that there was a defect in the pressure relief valve attached to the cylinder.  Dr. Romig stated he was told "the holder for the valve for the burst dis[c] was 20 percent smaller than it should have been."  At that time, Dr. Romig was aware plaintiffs "were looking at the pressure relief valve and also wanted to consider the internal explosion."  Blum inquired, "Now, when they called you up again in . . . 2018, were you told that the reason they wanted now to get back to you and reevaluate your opinion was because the case against the valve people had settled?"  Dr. Romig responded he was not told about the settlement at that time, although he learned of it later.  Dr. Romig testified that when plaintiffs' attorney Daniel Balaban contacted him in 2018, Balaban "wanted [him], based on what [he] had done before, to look at the internal explosion."  Balaban later set up a phone call between Dr. Romig and Dr. Glen Stevick.

Dr. Stevick testified for plaintiffs as an expert in mechanical engineering and failure analysis.  Dr. Stevick opined that if hydrocarbon is present in a cylinder being filled with nitrous oxide, static charges in the hose could cause "a very violent ignition or explosion."  By examining the remains of the cylinder that exploded at Noswerks under ultraviolet light, Dr. Stevick identified the presence of hydrocarbon, which he believed caused the explosion.  On cross-examination, Blum asked Dr. Stevick whether he had earlier declared under penalty of perjury that the explosion would not have occurred if the Rotarex valve and rupture disc attached to the cylinder had not

6

malfunctioned. Dr. Stevick replied, "Yes, I believed that at the time." Dr. Stevick had believed the valve was defective because if the rupture disc had been paired with the wrong holder, "that was clearly going to increase the pressure" at which the disc would rupture. Dr. Stevick acknowledged he had previously opined Rotarex should have warned the user about the potential risk of mispairing the disc and holder, "[o]r supplied a device that [is] already welded together so you can't mix them up."

Dr. Stevick explained he now believed a nondefective valve would have slightly lessened the intensity of the explosion, but he did not think "it ha[d] a chance with this fast of a detonation." Dr. Stevick attributed his change in opinion to his more complete review of the evidence and more precise calculations. Blum asked Dr. Stevick whether it was correct he decided more closely to examine the cause of the explosion "only after the settlement was reached with Rotarex." Dr. Stevick replied he did not know of the settlement at the time and learned of it later, but he could not recall when.

The trial court then asked a juror question of Dr. Stevick that read, "'When did your lab first invoice for testing the Catalina Cylinders explosion theory?'" Dr. Stevick responded it was on April 5, 2018. The court then read a follow up juror question that asked, "'When did your lab last invoice for the testing related to the Rotarex disc theory?'" Dr. Stevick answered February 28, 2018.

D. *Catalina's Closing Argument*

During his closing argument, Blum addressed the settlement between plaintiffs and Rotarex, arguing, "Dr. Stevick not only makes assumption after assumption after assumption,

7

but he does it after the plaintiffs settle with Rotarex and he does it after he claims that Rotarex is the sole cause; the settlement happens and now it's Catalina Cylinders. [¶] . . . He's a gun for hire. And for those of you that believe that this is a coincidence he changed his mind, I'll give you one fact or piece of testimony. And it actually comes from the mouth of one of the jurors, the question. [¶] One of the questions from the juror asked Dr. Stevick, when did you stop billing on Rotarex. [¶] I'm not going to tell you who, but whoever it is, give yourself a pat on the back. The date he said the last bill was February 28th. The settlement, February 27th. So they stopped billing the day after the settlement. And he said I don't know when the settlement happened. It's just [an] amazing coincidence."

Later in his closing, Blum returned to the subject of the settlement, arguing, "So at the end of the day, what we do have is a valve that everybody says was malfunctioning. We have a valve manufacturer who should have given a warning. We have a valve that was put together the wrong way. And as a result, it didn't blow when it should have blown. [¶] . . . And remember, other than Dr. Stevick they never put on a witness that said . . . that it operated properly. [¶] So when we look at percentages, the majority of the liability, the majority of the fault goes to Rotarex. They're the party who was responsible according to the plaintiffs up until the moment they settled with Rotarex. And then Dr. Stevick changed his mind after the settlement. [¶] Up until the settlement, it was Rotarex's fault. Up until the settlement, Rotarex should have done a cost benefit analysis and their failure to do it caused the damage. Up until the settlement, Rotarex should have warned, but they didn't. [¶] Up until the settlement, Dr. Stevick concluded that had it not been for

Rotarex there would not have been the deaths. His decision to change his mind smells. It doesn't pass the smell test. And the way it occurred with plaintiffs' attorneys calling up Dr. Romig and then Dr. Romig . . . intervening and then starting to work dealing with Catalina increases the stench. [¶] Remember, February 28th, he stops working. April 4, he starts on Catalina Cylinders. He's not doing anything in between. The April 4th date ties into Dr. Romig's testimony as to when they have this conference call, which was occasioned by Mr. Balaban calling Dr. Romig and saying let's start on the Catalinas. It reeks. The true fact is, the party they settled with was the party that was responsible."

At this point, Balaban objected, and Blum responded, "I'll clean it up, Your Honor." The trial court made no ruling, and Blum continued, "I'm not asking you to say the settlement is evidence of anything except [the] motive as to why they changed their mind. I want to be clear on that. And you shouldn't conclude that from a settlement Rotarex was responsible. That would be improper. [¶] But you can conclude that it was the motive that caused Dr. Stevick to change his mind. And it was the motive that caused Mr. Balaban to call up Dr. Romig and say let's start working against Catalina Cylinders. [¶] That's proper and that's the reasonable assumption to make. It's the motive. It's the reason why."

After Blum completed his argument, the trial court stated outside the presence of the jury, "You know, Mr. Blum, you're an excellent lawyer and you gave for the most part an excellent closing argument, but there were . . . points that really troubled me." The trial court expressed concern with Blum's statement "the true facts here is the party that settled was the party

responsible. [¶] Now, that might have just slipped out, but that is contrary to the jury instruction that I told them, that I said that you can only—that you can't use the fact of the settlement for anything related to responsibility."

When the jury returned, the trial court instructed, "As I previously instructed before the closing arguments, you are not allowed to consider the settlement to determine responsibility for any harm. You may consider the evidence only to decide whether a witness is biased or prejudiced because of the settlement and whether his testimony is believable."

E.    *The Verdict and Judgment*

On August 2, 2018 the jury reached a verdict and returned the special verdict form. Question 1 on the special verdict form asked, "Was Defendant Catalina Cylinders negligent?" The jury answered, "No." The form then instructed the jury to skip question 2 (based on a "no" answer to question 1). The jury did not answer question 2, which asked whether Catalina's negligence was a substantial factor in causing the harm.

The jury then answered the following questions on plaintiffs' strict liability failure to warn claim:

"3. Did Defendant Catalina Cylinders manufacture the subject cylinder?" The jury marked, "Yes."

"4. Did the subject cylinder have potential risks that were known or knowable in light of the scientific knowledge that was generally accepted in the scientific community at the time of manufacture?" The jury marked, "Yes."

"5. Did the potential risks present a substantial danger to persons using or misusing the subject cylinder in an intended or reasonably foreseeable way?" The jury marked, "Yes."

10

"6. Would ordinary persons have recognized the potential risks?" The jury marked, "No."

"7. Did defendant Catalina Cylinders fail to adequately warn or instruct of the potential risks?" The jury marked, "No."

The jury reached its verdict on question 7 by a vote of nine to three, and therefore it did not answer any further questions. Question 8 asked the jury, "Was the lack of sufficient instructions or warnings a substantial factor in causing harm to Roberto J. Lasarte and Juan Lasarte?" Had the jury answered question 8 in the affirmative, the verdict form instructed the jury to answer further questions regarding damages and comparative fault, including question 19, which asked the jury to apportion responsibility among Catalina, Rotarex, Roberto, and Custom Performance (which brought the exploded cylinder to Noswerks for refilling).

On September 19, 2018, based on the jury's findings on the special verdict form, the trial court entered judgment in favor of defendants.

F.      *Plaintiffs' Motion for a New Trial*

On October 4, 2018 plaintiffs filed a notice of intention to move for a new trial. In their new trial motion, plaintiffs argued, among other things, Blum committed prejudicial misconduct by arguing in closing the Rotarex settlement demonstrated Catalina was not liable. Plaintiffs further argued individual jurors committed prejudicial misconduct by asserting during deliberations the settlement demonstrated Rotarex's responsibility for the harm. Plaintiffs attached declarations from three jurors. Juror E. Lira declared, "During deliberations, some of the jurors mentioned Rotarex and the fact that there had been

11

a settlement with them and the plaintiff[s].  Some of the jurors said during deliberations that plaintiffs got money from Rotarex and if they settled out of court it was because Rotarex was admitting fault, so it's not Catalina Cylinders['] fault, it's Rotarex's fault.  [¶] . . . When we first walked into the room, before we started deliberations, Juror . . . Soto said 'I do not believe the family deserves anything' and that 'Catalina Cylinders should not be held responsible.'"  Juror N. Flores declared, "During deliberations, some of the jurors mentioned Rotarex and their settlement and that Rotarex was responsible for this."[2]

In opposition, Catalina argued any attorney misconduct was cured by the trial court's admonitions and plaintiffs failed to show prejudicial juror misconduct.  Catalina filed declarations from two jurors.  Juror D. Soto declared, "Our deliberations were based on the special verdict form, and we went question by question.  As such, the focus was on Catalina Cylinders' liability, and we did not really discuss the family.  [¶] . . . The majority of our deliberations focused on whether the Catalina Cylinders' warning label was adequate.  [¶] . . . We took out the label and passed it around for each juror to review.  Each juror had the opportunity to discuss his or her opinion as to the warning label. Everyone listened to each person and everyone had a chance to speak.  [¶] . . . [¶] . . . [¶] . . . I remember the mention of 'Rotarex' at some point while with my fellow jurors.  I cannot remember whether the word 'settlement' was also discussed in conjunction with the 'Rotarex' reference.  I cannot remember

---

[2]    Plaintiffs also attached a declaration from juror D. Hall, which did not include statements on juror misuse of the settlement evidence.

12

whether the 'Rotarex' referral was during actual deliberations or after the verdict was read and we were waiting—with the alternates—in the jury room for the Judge to speak to us. In any event, the mention of 'Rotarex' had no impact on my decision as to Catalina Cylinders' negligence or failure to warn." Juror D. Ancayan declared, "While I recall someone mentioning the Rotarex settlement, it was brought up after our deliberations were over, and the verdict was reached. The mention was made when we were waiting in the deliberation room for the Judge to come and speak to us."

The trial court granted in part and denied in part plaintiffs' motion. In its written ruling, the court held plaintiffs' juror declarations regarding the Rotarex settlement were admissible. The court found "the Lira Declaration is the most specific and the most credible of the declarations on this point. Indeed, Juror Flores more generally corroborated Juror Lira. That the subject was discussed, Juror Lira's statements [are] supported by the Defense declarants, Juror[s] Soto and Ancayan. The Court is mindful that Juror Lira was the sole juror to vote against the nine juror majority on both question 1 and question 7 in the special verdict form, which might suggest a strongly held view in favor of the Plaintiffs. However, the Court still believes Juror Lira was credible. The Court observed Juror Lira during the trial. He appeared focused and alert throughout and in the Court's view, conscientiously served as a juror. Hence, the admissible evidence demonstrates misconduct in connection with the Rotarex settlement during the jury deliberations, which raises a presumption of prejudice."

The trial court also found Blum's references to the settlement during closing argument constituted misconduct,

stating, "The settlement between the Plaintiffs and Rotarex was the subject of a motion in limine and a spirited argument by Plaintiffs' counsel on Motion in Limine No. 6.  In the end, the Court ruled the settlement could not be used to suggest Rotarex was responsible for the explosion but could be used for the *limited purpose of impeaching* the expert opinion testimony of Dr. Stevick.  Dr. Stevick changed his expert opinion after the settlement.  At the time of Rotarex's summary judgment motion, Dr. Stevick blamed the Rotarex valve for the explosion.  He testified he changed his opinion to implicate Catalina Cylinders after he received additional information from counsel and another of Plaintiffs' expert[s], Dr. Romig.  The Court held on the motion in limine that the intervening settlement was admissible, not to prove liability, but *only* to impeach the second opinion by Dr. Stevick.  [¶]  . . .  The only permissible argument here was that Dr. Stevick's second opinion should not be believed because it came after Rotarex settled.  [¶]  Counsel did not limit the argument to the change in testimony of Dr. Stevick.  Instead, counsel stated 'the true fact is, the party they settled with was the party that was responsible,' . . . after a series of statements that began '[u]p until the settlement, it was Rotarex's fault.' . . . By tying the settlement with Rotarex to Rotarex's fault, defense counsel went beyond merely using the settlement to impeach Dr. Stevick.  Instead[,] the argument implicated the very policy reason why settlement evidence is explosive and usually excluded.  The argument was not that Dr. Stevick's second opinion should be disbelieved because he changed it after . . . Rotarex settled, though counsel did mention this as well.  But counsel's argument largely neglected the proper use—

14

Dr. Stevick's impeachment, and focused on the improper use, Rotarex settled because it was responsible for the explosion."

The court noted Balaban's objection and Blum's attempt to "clean it up," but "ultimately [Blum] did not. Instead, counsel said 'I'm not asking you to say the settlement is evidence of anything except [the] motive as to why they changed their mind. . . . And you shouldn't conclude that from a settlement Rotarex was responsible. That would be improper.' Then counsel identified the only admissible reason to mention Rotarex at all. 'But you can conclude that it was the motive that caused Dr. Stevick to change his mind.' That is exactly where defense counsel should have left it. But defense counsel continued that the settlement was relevant to 'the motive that caused Mr. Balaban to call up Dr. Romig and say let's start working against Catalina [C]ylinders.' Mr. Balaban's motive to ask for an expert opinion from Dr. Romig is irrelevant."

As to the prejudice to plaintiffs caused by the attorney and juror misconduct, the trial court reasoned, "That the additional instruction and counsel's own statement were not enough [to direct the jury], is a testament to the power of settlement evidence and a cautionary tale about the wisdom of Evidence Code [section 1152] and CACI [No.] 217. The Court finds that the argument caused prejudice to Plaintiffs because the additional instructions were insufficient to alleviate the taint of the improper use of the Rotarex settlement. In the proverbial sense, once the improper argument was made, neither the Court nor counsel could put Humpty Dumpty back together again. [¶] But even if the closing argument was not prejudicial, there is admissible evidence some jurors disregarded the instructions and counsel's later statement about the use of the settlement. . . .

15

The evidence raised a presumption of prejudice that was not rebutted by the evidence from one juror, which was less credible [than] the other admissible evidence, that the jurors mentioned the Rotarex settlement only after the verdict was reached."

The court continued, "The lawyer and juror misconduct concerning the Rotarex settlement impacts the two causes of action differently . . . . On the negligence claim, the jurors were concerned with Rotarex only after they found Catalina negligent . . . . [¶] It is also possible someone could have mentioned Rotarex on the substantial factor question, that is, Catalina['s] conduct was not a substantial factor because Rotarex settled and was responsible. But the jurors never got to Question 2. [¶] In the Court's view, it is unlikely the jury's vote in favor of [Catalina] on Question 1 had anything to do with Rotarex or the settlement. It is significant that the credible juror declarations do not state when the improper use of the Rotarex settlement occurred. . . . The Court cannot conclude that the misuse of the Rotarex settlement happened before the first question on negligence was answered. On this record, it is more probable it did not. [¶] In addition, the Court heard the evidence on negligence and in the Court's view, the verdict would have been the same on Question 1, even if a juror said Rotarex was responsible because of the settlement at some point in their deliberations. Accordingly, the Court cannot conclude that in the absence of the juror and defense misconduct concerning negligence, it is reasonably probable the jury would have reached a different result.

However, as to the strict liability cause of action, the trial court concluded, "It is easy to see how absent the misuse of the Rotarex settlement, the verdict on this claim may have been

16

different. . . . Catalina's affirmative defense that Rotarex was the cause of the explosion was a complete defense to the failure to warn cause of action. . . . However, there are no questions on the special verdict form concerning this affirmative defense. If the jurors found that Catalina prevailed on the affirmative defense, they would have voted against the Plaintiffs on one of the strict liability questions. That is exactly what the jury did. [¶] More importantly, the affirmative defense would have necessarily caused the jurors to discuss Rotarex's responsibility when answering the questions concerning strict liability. Unlike Question 1 which had nothing to do with Rotarex and focused entirely on Catalina's conduct, the jurors had to consider Rotarex on the strict liability issue and that it is most likely when any improper use of [the] settlement occurred. It would explain the decision to find for Catalina on Question 7. For purposes of this motion, the combination of unrebutted presumed prejudice and the misuse of the settlement on the 9-3 vote on Question 7, leads the Court to conclude that a new trial is warranted on the strict liability failure to warn cause of action."

Catalina timely appealed.

## DISCUSSION

A. *Standard of Review*

An order granting a new trial, including on grounds of attorney or juror misconduct, is reviewed for an abuse of discretion and "'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.'" (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 409; accord, *Nissan*

17

*Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 811 (*Nissan*) [evaluating trial court's order granting new trial based on juror misconduct for an abuse of discretion]; *Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 159 (*Whitlock*) ["where the trial court supplies a statement of reasons as required by [Code of Civil Procedure] section 657, as the trial court did here, the applicable standard of review is abuse of discretion"].)[3]

"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.  This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter." (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387; accord, *Nissan, supra*, 63 Cal.App.5th at p. 811.)  "[A]n appellant seeking to overturn a trial court's discretionary ruling [granting a motion for new trial] faces 'more than a daunting task [and] an uphill battle' in demonstrating the court exercised its discretion arbitrarily and unreasonably." (*Nissan*, at pp. 821-822 [affirming trial court's grant of new trial based on juror misconduct in a lawsuit against car dealerships where juror failed to disclose she had been a defendant in multiple civil actions and had family members with connections to other car dealerships].)

"In evaluating the evidence, we must draw all inferences in favor of the prevailing party and accept the trial court's resolution of conflicts in the evidence." (*Nissan, supra*, 63 Cal.App.5th at p. 811; accord, *Whitlock, supra*,

---

[3]     It is undisputed the trial court stated its reasons for granting the new trial motion in compliance with Code of Civil Procedure section 657.

18

160 Cal.App.4th at p. 160 ["[I]t is the trial court that must assess the credibility of affiants or declarants, and the trial court is entitled to believe one over the other."].)  "We also must extend deference to orders granting new trials because "'[t]he trial judge is familiar with the evidence, witnesses and proceedings, and is therefore in the best position to determine whether, in view of all the circumstances, justice demands a retrial.'"" (*Nissan*, at p. 821; accord, *Whitlock, supra*, 160 Cal.App.4th at p. 159.)

"[O]ur review for abuse of discretion extends to all aspects of the trial court's order granting a new trial, including the trial court's prejudice ruling." (*Whitlock, supra*, 160 Cal.App.4th at p. 160; accord, *People v. Ault* (2004) 33 Cal.4th 1250, 1255 (*Ault*) ["[A]n order granting, as opposed to denying, a new trial is reviewed liberally, particularly with regard to the trial court's finding that an error or irregularity in the original trial was prejudicial."].)  Where juror misconduct is shown, "[t]his analysis of prejudice 'is different from, and indeed less tolerant than,' normal harmless error analysis, because jury misconduct threatens the structural integrity of the trial." (*McDonald v. Southern Pacific Transportation Co.* (1999) 71 Cal.App.4th 256, 266; accord, *People v. Nesler* (1997) 16 Cal.4th 561, 579.)

B. *The Trial Court Did Not Abuse Its Discretion in Granting a New Trial*

    1. *The trial court did not abuse its discretion in finding attorney misconduct*

"Section 657, subdivision (1), of the Code of Civil Procedure provides that a new trial may be granted for an '[irregularity] in the proceedings of the court, jury or adverse party . . . by which either party was prevented from having a fair trial.'  It is well

settled that misconduct of counsel is such an irregularity and a ground for new trial." (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870; accord, *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1411 ["Attorney misconduct is a ground for a new trial."]; *Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148 ["Attorney misconduct is an irregularity in the proceedings and a ground for a new trial."].)

"[M]isconduct by counsel in closing argument in civil cases can constitute prejudicial error entitling the aggrieved party to reversal of the judgment and a new trial. 'It is . . . well settled that misconduct [by counsel] has often taken the form of improper argument to the jury, such as by urging facts not justified by the record or suggesting that the jury may resort to speculation [citation]; by informing the jury that an injured party has been compensated by a codefendant [citation]; and by informing the jury of an offer of settlement and compromise.'" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802 (*Cassim*); accord, *City of Los Angeles v. Decker, supra*, 18 Cal.3d at p. 870.) "'[T]here is no inherent requirement that the misconduct be of a continuous nature' and . . . a single instance of misconduct can justify reversal." (*Cassim*, at p. 803; accord, *Hoffman v. Brandt* (1966) 65 Cal.2d 549, 551 & fn. 1, 555 [defense attorney's single comment during closing argument that a verdict for the plaintiff would force the elderly defendant into a home for the indigent was prejudicial misconduct, uncured by trial court's equivocal admonition the argument was not evidence].)

Evidence Code section 1152, subdivision (a), provides in relevant part, "Evidence that a person has, in compromise . . . , furnished or offered or promised to furnish money or any other thing . . . to another who has sustained . . . loss or damage . . . is

20

inadmissible to prove his or her liability for the loss or damage or any part of it."  (See *Diamond v. Reshko* (2015) 239 Cal.App.4th 828, 843 [Evidence Code section 1152, subdivision (a), "codifies the rule that evidence of a settlement agreement between a plaintiff and one or more joint tortfeasors is not admissible to prove the liability of the settling tortfeasor"].)  However, "evidence of a plaintiff's settlement with one or more defendants is admissible at trial to prove witness bias and to prevent collusion."  (*Diamond*, at p. 843; accord, *Zelayeta v. Pacific Greyhound Lines* (1951) 104 Cal.App.2d 716, 729 [settlement "evidence may be admissible to show bias or prejudice of an adverse witness"].)

An attorney's use of evidence of a settlement to argue for liability where liability is disputed constitutes attorney misconduct.  (See *Shepherd v. Walley* (1972) 28 Cal.App.3d 1079, 1083-1084 [finding prejudicial misconduct where defense attorney argued in closing a dismissed defendant's settlement with plaintiff "'gives us a pretty good idea of who the plaintiff thinks was responsible and liable'"]; *Granville v. Parsons* (1968) 259 Cal.App.2d 298, 302-304 [attorney misconduct prejudicial where trial court ordered evidence of settlement could be used only to argue witness credibility, but counsel in closing argued "'*[t]hey know who was the guilty party in this accident because you heard*'" a prior defendant settled].)  However, "[a]ttorney misconduct can justify a new trial only if it is reasonably probable that the party moving for a new trial would have obtained a more favorable result absent the misconduct."  (*Rayii v. Gatica, supra*, 218 Cal.App.4th at p. 1411; accord, *Cassim, supra*, 33 Cal.4th at pp. 801-802; *Garcia v. ConMed Corp., supra*, 204 Cal.App.4th at p. 149 ["In order to justify a new trial [for attorney misconduct],

21

the party must demonstrate that the misconduct was prejudicial."].)

In evaluating whether attorney misconduct was prejudicial, courts consider "'(1) the nature and seriousness of the misconduct; (2) the general atmosphere, including the judge's control of the trial; (3) the likelihood of actual prejudice on the jury; and (4) the efficacy of objections or admonitions under all the circumstances.'" (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 296; accord, *Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 568, 570 [numerous references by counsel for defendant public agency during trial to the jury's self-interest as taxpayers, plaintiff's loss of job to show his laziness, and comparison of logo on plaintiff's motorcycle to Nazi imagery constituted prejudicial misconduct].)

Catalina contends the trial court abused its discretion in granting plaintiffs' new trial motion because Blum's closing argument did not rise to the level of attorney misconduct. Catalina argues Blum's statement during closing argument that "the party [plaintiffs] settled with was the party that was responsible" simply "ma[d]e a logical observation concerning what the jury had heard." Catalina also asserts the court's in limine ruling did not "limit how Catalina's attorney could use the evidence of the settlement to make his point that [Dr.] Stevick should not be believed." These contentions lack merit.

As discussed, the trial court ruled on plaintiffs' motion in limine that evidence of the settlement with Rotarex could only be "used to impeach expert witnesses who have changed their opinions if they offer evidence concerning why they changed their

opinion."[4]  During Blum's cross-examination of Dr. Stevick, Blum properly used the settlement for this limited purpose.  In his closing argument, Blum likewise pointed out that Dr. Stevick continued to bill plaintiffs for his expert opinions on the Rotarex valve until one day after the plaintiffs and Rotarex settled, arguing this could not be a coincidence.  But when Blum's argument reached the apportionment of fault, he returned to the subject of the settlement, stating, "So when we look at percentages, the majority of the liability, the majority of the fault goes to Rotarex.  *They're the party who was responsible according to the plaintiffs up until the moment they settled with Rotarex.*  And then Dr. Stevick changed his mind after the settlement." (Italics added.)  At this point Blum crossed the line from arguing Dr. Stevick's bias to improperly linking Rotarex's settlement with its responsibility for the explosion.

Blum continued by arguing Dr. Stevick's "decision to change his mind" did not "pass the smell test."  But this time Blum invoked the settlement to explain why plaintiffs changed their position, not Dr. Stevick.  Blum argued plaintiffs' attorneys' action in then "calling up Dr. Romig" and focusing on Catalina "increases the stench."  After further noting the timing of Balaban calling Dr. Romig to "start on the Catalinas," Blum added, "The true fact is, the party they settled with was the party that was responsible."  Balaban objected, and Blum offered to "clean it up," which the trial court allowed.

Blum clarified that the jury "shouldn't conclude that from a settlement Rotarex was responsible.  That would be improper." However, the jury could conclude that the settlement was the

---

[4]    Plaintiffs do not contend the trial court erred in admitting the settlement evidence for purposes of impeachment.

23

"motive" that caused Dr. Stevick to change his opinion. This distinction was proper. But then Blum again crossed the line in emphasizing that the settlement "was the motive that caused Mr. Balaban to call up Dr. Romig and say let's start working against Catalina Cylinders."

As plaintiffs contend, Blum's argument—both before and after the attempted "clean it up"—violated the court's in limine ruling because Blum's use of the settlement to impugn the motivation of plaintiffs was not properly limited to impeachment of expert witnesses who changed their opinions, but instead falsely implied plaintiffs held Catalina blameless until they settled with Rotarex. To the extent Catalina contends Blum's argument involved no such implication, we defer to the trial court's finding to the contrary, drawing all inferences in favor of the trial court's ruling. (*Nissan, supra*, 63 Cal.App.5th at p. 929.)

Moreover, Blum's attempt to remedy his improper statement—that the party who settled with plaintiffs was responsible—was not successful. Nor was the trial court's subsequent admonition to the jury not "to consider the settlement to determine responsibility for any harm." As shown by Lira's declaration, some of the jurors discussed during deliberations that if plaintiffs settled with Rotarex, "it was because Rotarex was admitting fault, so it's not Catalina Cylinders' fault, it's Rotarex's fault." Flores likewise said that during deliberations "some of the jurors mentioned Rotarex and their settlement and that Rotarex was responsible for this." The trial court found Lira's declaration was the most specific and credible of the declarations. And the Soto declaration submitted by Catalina confirmed there were discussions of the Rotarex settlement in the

24

jury room, although she was not sure the timing of the discussion.

Catalina fails to distinguish *Granville v. Parsons, supra*, 259 Cal.App.2d at pages 303-304, which is on all fours. There, the Court of Appeal concluded the defense attorney committed prejudicial misconduct after the trial court ordered a settlement with a codefendant could be used only to argue witness credibility, but counsel in closing argued, "'They know who was the guilty party in this accident because you heard that Mr. Short was a defendant in this action and settlement." (*Ibid.*) *Tobler v. Chapman* (1973) 31 Cal.App.3d 568, relied on by Catalina, is distinguishable. The Court of Appeal in *Tobler* affirmed the trial court's denial of plaintiffs' claim of prejudicial attorney misconduct based on defense counsel's reference at trial to plaintiffs' dismissal of a codefendant midtrial. (*Id.* at pp. 577-578.) But unlike here, the defense attorney in *Tobler* did not reference plaintiffs' settlement of claims, stating only that "'[w]hen the case was dismissed as to the [codefendants] this morning, it then became my duty to discuss the damages with you'" and "'simply because there was a clear case of liability as to the [dismissed codefendants] doesn't mean that the plaintiff has a liability case as to every defendant in this situation.'" (*Id.* at p. 577.)

Catalina was entitled to impeach Dr. Stevick with reference to the settlement agreement and to argue Rotarex was the party responsible for plaintiffs' injuries, but it had to walk a fine line to separate the two arguments. Blum failed, linking his argument Dr. Stevick changed his opinion based on the settlement and his argument "the majority of the liability" rested with Rotarex. As the trial court observed, "By tying the settlement with Rotarex to

Rotarex's fault, defense counsel went beyond merely using the settlement to impeach Dr. Stevick."

2. *The trial court did not abuse its discretion in finding the attorney misconduct and juror misconduct were prejudicial*

"Juror misconduct is one of the specified grounds for granting a new trial. (Code Civ. Proc., § 657, subd. 2.)" (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345; accord, *Whitlock, supra*, 160 Cal.App.4th at p. 159.) "'In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. [Citation.] First, it must determine whether the affidavits supporting the motion are admissible. (Evid. Code, § 1150.) If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.] Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial.'" (*Whitlock*, at p. 160; accord, *Barboni*, at p. 345.) If the reviewing court concludes admissible evidence establishes juror misconduct, prejudice is presumed unless rebutted. (*People v. Marshall* (1990) 50 Cal.3d 907, 949; accord, *People v. Honeycutt* (1977) 20 Cal.3d 150, 156 ["It is well settled that a presumption of prejudice arises from any juror misconduct."]; *Whitlock*, at p. 162 ["'A showing of [juror] misconduct creates a presumption of prejudice.'"].)

The trial court must then determine whether, in light of the entire trial record, the presumption is rebutted because there is no substantial likelihood one or more jurors were impermissibly influenced to the detriment of the party moving for a new trial. (See *Ault, supra*, 33 Cal.4th at p. 1267 [affirming trial court's

26

granting of new trial where juror in child molestation case shared with other jurors story from outside source that a friend had been molested by her father but acted normally]; see also *In re Manriquez* (2018) 5 Cal.5th 785, 798 [finding juror concealment of childhood abuse was not prejudicial].)

Catalina does not argue plaintiffs' juror declarations were inadmissible or that the declarations do not support the trial court's finding of juror misconduct. Catalina also acknowledges the trial court's finding of juror misconduct created a presumption of prejudice to plaintiffs, shifting the burden to Catalina to rebut the presumption. But Catalina contends it rebutted the presumption by relying on the special verdict form, in which the jury found Catalina's warnings were adequate (question 7). Catalina argues this finding did not implicate Rotarex's responsibility for the harm, and the jury did not reach the special verdict form questions asking whether the lack of a sufficient warning was a substantial factor in causing the harm (question 8) or the comparative responsibility of Rotarex question 19).[5] The trial court did not abuse its discretion in concluding

---

[5] We reject plaintiffs' contention Catalina forfeited its argument the special verdict form rebutted the presumption of prejudice by not citing the applicable standard of review or providing an adequate factual analysis. Catalina has sufficiently briefed the issue of prejudice on appeal. Plaintiffs also argue Catalina failed to provide an adequate appellate record by omitting the parties' evidentiary objections to the declarations submitted in support of and in opposition to plaintiffs' new trial motion. This contention lacks merit because neither party argues the trial court abused its discretion in making its evidentiary rulings.

otherwise. [6]

Catalina argues there was no reason to assume "the jury lacked the competence and basic understanding of its responsibility to read, understand, and answer the discrete question put to it" by the special verdict form. But the trial court found the Lira and Flores declarations established that some jurors failed to follow the trial court's oral and written instructions by relying on the settlement as evidence of Rotarex's liability and voicing that view to the other jurors during deliberations. This fact supports the trial court's finding that the jurors who believed Rotarex was the responsible party because of the settlement likely cast their votes against finding Catalina liable on the strict liability cause of action by "vot[ing] against the Plaintiffs on one of the strict liability questions."

Question 7 was the first question that directly focused on Catalina's responsibility for the harm in the strict liability failure to warn section of the verdict form. Question 3 asked simply whether Catalina manufactured the subject cylinder. Questions 4 through 6 focused on the cylinder, not whether

---

[6] We consider the prejudicial impact of the attorney and juror misconduct together because the test for whether attorney misconduct was prejudicial asks both "the likelihood of actual prejudice on the jury" and "the efficacy of objections or admonitions under all the circumstances." (*Martinez v. Department of Transportation, supra*, 238 Cal.App.4th at p. 568.) Because several jurors committed misconduct in making improper use of the Rotarex settlement during deliberations despite Blum's attempt to "clean it up" and the trial court's instructions, the attorney and juror misconduct together weigh heavily in favor of the trial court's finding of prejudice.

28

Catalina or Rotarex was at fault (asking whether the cylinder had potential known risks, whether the risks presented a substantial danger to a user, and whether ordinary persons would have recognized the risks). It was question 7 that focused on Catalina, asking whether Catalina failed adequately to warn of the potential risks. Although the jury could have answered question 7 "yes," then found Catalina not liable by voting "no" on question 8 (that the lack of a warning was not a substantial factor in causing harm), as plaintiffs' counsel asserted at oral argument, it is not reasonable to assume that jurors who had gone "rogue" by improperly discussing Rotarex's settlement during deliberations then would have properly selected the most applicable question on which to determine that Catalina had no liability for the explosion. And as plaintiffs' counsel pointed out, questions 4 through 6 are silent as to what potential risk the cylinder posed (that is, a risk from the cylinder itself or the valve). If a juror believed the potential known risk was the Rotarex valve attached to the cylinder, that juror may have voted "no" on question 7, believing Catalina did not fail adequately to warn about the dangerous condition created by the Rotarex valve, which was responsible for the explosion as shown by Rotarex's settlement with plaintiffs. Moreover, if the jurors read and understood question 7 to focus on the narrow question of the adequacy of Catalina's warning, there would have been no reason for the jurors to discuss the Rotarex settlement prior to reaching question 8, asking whether the lack of an adequate warning was a substantial factor in causing harm to Roberto and Juan.

That nine jurors voted "no" in response to question 7 further supports the trial court's prejudice finding. If even one of the nine jurors voted no on question 7 to absolve Catalina of

liability based on his or her improper consideration of the settlement, that vote would have been determinative of the verdict. (See *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 ["Since the verdict was nine to three, the disqualification for bias of any one of the majority jurors could have resulted in a different verdict."]; *Whitlock, supra*, 160 Cal.App.4th at p. 163 [juror misconduct in discussing evidence outside the trial record likely influenced "the decisive ninth vote in favor of the verdict"]; see also *Martinez v. Department of Transportation, supra*, 238 Cal.App.4th at p. 570 [stating, in the context of overwhelming attorney misconduct, "[a] jury prejudiced against a litigant and determined to find against that litigant is not one whose judgment can be trusted"].)

Catalina contends further the trial court's reasoning in denying a new trial on negligence—that the jury did not reach the question of comparative liability—should have likewise caused the court to deny a new trial on the strict liability failure to warn. However, the court's reasons for denying a new trial on negligence were not so limited. The court also observed that the evidence supporting the negligence claim was relatively weak compared to the strict liability failure to warn claim, such that it was unlikely the result would have been different absent the juror misconduct. Moreover, even if the court's reasoning as to the negligence claim was flawed, plaintiffs have not appealed the court's denial of a new trial on that cause of action, and that ruling is not before us.

Catalina's attempt to minimize the impact of the jurors' improper consideration of the Rotarex settlement by arguing it was unlikely to have influenced the jury's deliberations runs counter to "[t]he strong public policy favoring settlement

30

negotiations and the necessity of candor in conducting them" embodied in Evidence Code section 1152. (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 13; accord, *Heimlich v. Shivji* (2019) 7 Cal.5th 350, 360 ["Parties should be encouraged to make offers without fear that they will be treated as an admission of either liability or the minimal value of a claim."].) As the trial court reasoned, the jury's consideration of the Rotarex settlement to determine Catalina's liability was precisely the danger the Legislature sought to ameliorate in Evidence Code section 1152, and it "implicated the very policy reason why settlement evidence is explosive and usually excluded."

The trial court therefore did not abuse its discretion in determining on the entire trial court record that because of juror misconduct there was a substantial likelihood that at least one juror was impermissibly influenced to plaintiffs' detriment. (*Ault, supra*, 33 Cal.4th at p. 1261.)

Catalina's reliance on *Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115 (*Romo*), cert. granted and judgment vacated by *Ford Motor Co. v. Romo* (2003) 538 U.S. 1028, disapproved by *Ault, supra*, 33 Cal.4th at p. 1272, is misplaced. In *Romo*, after the jury returned a verdict for the plaintiffs, the trial court granted a new trial on punitive damages based on juror misconduct, where one juror stated during deliberations she had viewed a television program on the defendants' litigation strategy for defective vehicles and another juror shared that she had a dream in which a car manufactured by the defendant ran over several children, and she repeatedly stated the jury must "save the babies" from the defendant. (*Romo,* at pp. 1127-1129.) Reviewing the issue of prejudice de novo, the Court of Appeal

31

reversed the trial court, reasoning prejudice was unlikely given that "[j]urors ordinarily are presumed to have followed the court's instructions." (*Id.* at p. 1131.) The Supreme Court in *Ault, supra*, 33 Cal.4th 1250 disapproved of *Romo*'s application of a de novo standard of review to the trial court's grant of a new trial based on juror misconduct, instead of the applicable deferential abuse of discretion standard. (*Ault*, at p. 1272, fn. 15.) Moreover, in *Romo* the jury foreperson admonished the jury to disregard the juror's description of the television program, and there was no further discussion of the juror's dream after the trial court admonished the jury to decide the case solely on the law and facts presented at trial. (*Romo*, at pp. 1133-1134.) Here, the jurors who misused the settlement evidence did so after the court's admonishment to the contrary, and there is no evidence the foreperson or any other juror admonished the jurors who improperly considered the Rotarex settlement.[7]

---

[7] *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, *Bristow v. Ferguson* (1981) 121 Cal.App.3d 823, and *People ex rel. Department of Public Works v. Hunt* (1969) 2 Cal.App.3d 158, relied on by Catalina, are distinguishable. In all three cases the Courts of Appeal concluded the trial court had abused its discretion in granting a new trial, finding no likelihood of prejudice to the appellant. (*Caldwell*, at pp. 205-206; *Bristow*, at p. 828; *Hunt*, at p. 172.) However, none of the cases involved juror misconduct. In *Caldwell*, the Court of Appeal concluded in an employment discrimination case the trial court erred in instructing the jury on the burden-shifting framework of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. (*Caldwell*, at p. 206.) But the court found plaintiffs had not shown a likelihood of prejudice because the jury found the defendant had not discriminated against the plaintiff, so the jury did not reach the questions on the special verdict form that would

32

## DISPOSITION

The order is affirmed.  Plaintiffs are to recover their costs on appeal.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

---

have been affected by the instructional error.  (*Ibid*.)  In *Bristow*, the Court of Appeal observed the erroneous instruction identified by the plaintiff was "plainly misleading, but in a direction favoring plaintiff."  (*Bristow*, at p. 828.)  *Hunt* was a condemnation proceeding in which the jury awarded the condemnees $35,000 for their property that had been taken.  (*Hunt*, at p. 160.)  The trial court granted the condemnees' motion for a new trial based on surprise where the plaintiff's expert appraiser unexpectedly testified the condemned property was worth only $27,200, but the condemnees were led to believe the expert would value the property at $33,000 to $35,000.  (*Id.* at p. 162.)  The Court of Appeal reversed, finding no likelihood of prejudice where the jury awarded the condemnees the higher value for the property.  (*Id.* at p. 172.)