Filed 4/23/26  P. v. Saravia CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHN EDWIN SARAVIA,<br><br>    Defendant and Appellant. | B337430<br><br>(Los Angeles County Super. Ct. No. TA154412) |

APPEAL from an order of the Superior Court of Los Angeles County, Carol J. Najera, Judge.  Affirmed.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, and Marc A. Kohm and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted John Edwin Saravia (defendant) of the first degree murder of Jonathan Cabrera (Cabrera). The trial court sentenced defendant to 60 years to life in prison. We are asked to decide (1) whether the trial court abused its discretion when it dismissed a juror mid-trial for expressing a view, uninformed by evidence at trial, that video evidence had been "doctored"; and (2) whether the court should have instructed the jury on the lesser included offense of manslaughter on a heat of passion theory.

## I. BACKGROUND

### A. *The Offense Conduct*

In late March 2021, Cabrera's wife, Yvette Villalba (Yvette), and his teenaged stepchildren, Yoel and Jade, were unloading groceries from their car and bringing them into their home in the Jasmine Garden apartment complex. J.M.,[1] his girlfriend Maryana Cibrian (Cibrian), and her younger sister walked past the Cabrera family's apartment, and Yoel told his mother that he believed the three passersby were responsible for shooting a paintball or BB pellet into the family's backyard. Yoel and J.M. exchanged glances and then words, with the latter being "aggressive." Before matters could escalate further, Yvette directed Yoel to go inside their home; J.M. and his female companions walked away.

Minutes later, as Yvette and her daughter were still bringing in groceries, J.M. returned with defendant and a group

---

[1]     We refer to J.M. by his initials because the record contains conflicting testimony about his age at the time of Cabrera's murder.

2

of other young men.  In a manner that was "aggressive," defendant asked for Yoel.  While standing on her apartment's covered front porch, Yvette, who believed her son was in danger, talked with defendant, who was the group's spokesman, and the group ultimately left.  In the aftermath of the confrontation, however, Yvette repositioned the home's security camera so that it better covered the front porch area.

Two days later, as Cabrera, Yoel, and Jade were bringing in laundry from their car to the apartment, another confrontation involving defendant and the Cabrera family occurred.  As J.M., Cibrian, and her sister walked past the Cabrera apartment, J.M. made a comment that irked Cabrera and he told J.M. to respect his elders.  J.M. left the area but vowed "we're gonna get you."

Moments later, J.M. returned with defendant and a group of other young men who closed in around the porch.  As the men approached, Yvette and Jade unsuccessfully tried to get Cabrera off the front porch and into the apartment.  Defendant did not say anything as the group confronted Cabrera, and when one of the young men threw a punch at Cabrera, Cabrera tossed a small plastic dog gate in their direction, which landed without striking anyone.[2]  Defendant then drew a firearm and shot Cabrera from a distance of a few feet away.

The bullet defendant fired passed through Cabrera's heart, aorta, and left lung before exiting his back and penetrating the apartment's front window.  After being shot, Cabrera clutched his

---

[2]     At trial, Yvette and Jade testified Cabrera did not throw the gate at anyone in particular; rather, he threw the gate to force the group as a whole to back away.  In contrast, Cibrian testified Cabrera threw the gate directly at defendant.

3

chest, staggered, and collapsed. Defendant "kind of froze" for a moment after shooting Cabrera, and then he and the rest of his group "scattered" and fled the scene.

When paramedics arrived minutes after Yvette and Jade called 911, Cabrera was dead. Shortly after Los Angeles County Sheriff's deputies arrived at the scene, Yvette showed them video footage from her home surveillance camera and provided them with a copy of the video.

### B.     *Defendant's Conviction and Sentencing*

The Los Angeles District Attorney charged defendant with murdering Cabrera "willfully, deliberately[,] and with premeditation." (Pen. Code,[3] §§ 187, subd. (a), 189, subd. (a).) The information further alleged defendant personally used a firearm in the commission of the murder (§ 12022.5, subd. (a)) and had previously sustained a prior "strike" conviction within the meaning of the Three Strikes Law (§§ 667, subds. (b)-(j), 1170.12).

At trial, four eyewitnesses identified defendant as the shooter: Yvette, Jade, Cibrian, and Oscar Tavares (Tavares), a neighbor in the apartment complex who was outside retrieving his dog at the time of the shooting. The prosecution also presented video footage from the surveillance camera that (as discussed *post*) captured some of the confrontation that ultimately led to Cabrera's murder. The defense called one witness during the defense case: a research psychologist whose area of expertise was human memory in forensic settings.

---

[3]     Undesignated statutory references that follow are to the Penal Code.

4

The jury found defendant guilty of first degree murder and found the firearm allegation true. After finding the prior "strike" allegation true, the court sentenced defendant to a total of 60 years to life in prison.

## II. DISCUSSION

Defendant argues we should reverse his murder conviction because the trial court improperly dismissed a juror (Juror No. 1352) in the middle of the trial after he expressed doubts—based on his professional experience—about the authenticity of the video evidence from the home surveillance camera. Reversal is not warranted, however, because the evidence the trial court relied on to dismiss Juror No. 1352, i.e., a typewritten note from the juror and the juror's answers to questions from the court and defense counsel, established a seemingly unalterable bias against the video evidence that was untethered to the facts presented at trial.

Defendant additionally argues reversal is required because the trial court declined to instruct the jury on the lesser included offense of heat of passion manslaughter. Lesser included offense instructions are necessary, however, only where there is substantial evidence to support the instruction. There was no such evidence supporting a heat of passion manslaughter instruction in this case when there was no testimony that defendant was acting under the influence of an intense emotion when he shot Cabrera.

5

### A. The Trial Court Did Not Err in Excusing Juror No. 1352

#### 1. Additional background

Shortly after Los Angeles County Sheriff's deputies arrived at the scene of Cabrera's murder, they observed a surveillance camera in the area of the front doorstep near where Cabrera's body was lying. In the evening on the same day of the shooting, Yvette showed the video from the camera to a deputy, who copied and shared it with other deputies.

Yvette explained to the deputy, and later that same night to detectives, that the video footage (less than three minutes in length) "skipped" at certain points and suggested law enforcement contact the camera company to obtain more complete footage. The deputy who obtained the footage similarly observed that the footage of the incident at times seemed to "skip forward" several frames or seconds. Because of these "skips," the video did not show Cabrera tossing the pet gate at defendant's group, nor did it show defendant shooting Cabrera. Detectives were thereafter unable to obtain a copy of the video that seamlessly displayed the confrontation, the shooting, and its aftermath.

During opening statements at defendant's trial, the prosecution informed the jury that there was video footage of the incident leading up to Cabrera's murder and its immediate aftermath, but the video did not show the actual shooting because the video "skips every little while." The defense opening statement did not attack the authenticity of the surveillance video. Instead, the defense stressed the "power of suggestion" in human memory and asked the jury to pay particular attention to

6

how the memories of the principal eyewitnesses were influenced by viewing the footage from the surveillance camera.

Midway through the prosecution's case-in-chief at trial, the court discharged a juror and replaced that juror with an alternate, Juror No. 1352. Three days later, before the prosecution rested, Juror No. 1352 delivered a one-page, typewritten "[n]ote" to the trial court expressing concern about whether he should continue to serve in light of his feelings about the "validity of the video evidence."

In his note, Juror No. 1352 stated he had more than three decades of experience in "how video is recorded, transported, compressed[,] and stored." Based on this experience, Juror No. 1352 said he found it incredible that the surveillance camera failed to record the shooting: "Am I supposed to believe that [the] video actually '**skips**' as we have been told? . . . Is someone telling me that this security camera (which has some type of motion sensor) just happened to 'skip' (or malfunction) <u>only</u> during the point where the suspect would have presumably pulled [out a] gun and shot the victim?" (Emphasis in original.) Juror No. 1352 also expressed incredulity that the camera's manufacturer, "one of the top security companies in the country," could not recover the missing footage. Juror No. 1352 concluded his note by stating "**Video doesn't skip**" (emphasis in original) and by wondering whether the court had "edit[ed]" the video or the prosecution or the defense had "removed" footage of the shooting.

Outside the presence of the jury, the trial court explained to Juror No. 1352 that the evidence presented thus far did not call into question the validity of the video and that the juror was "not supposed to speculate on evidence that you haven't gotten." In response, Juror No. 1352 explained, "It's like if you said, here's

7

a photograph, but to me it's obviously an oil painting.  It's hard for me to say, here's a video.  It's obviously more than one clip to me."  Using the juror's analogy, the court asked whether Juror No. 1352 could accept that the video was a photograph and not an oil painting; Juror No. 1352 advised that he could "try to live with what I promised to do in terms of evidence, but it's very hard."  When the court pressed him on whether he could accept the video's authenticity in the absence of contrary evidence, Juror No. 1352 stated, "I can't imagine I could go in the jury room and not tell these other people that someone's telling me something that I don't believe to be true. . . . [¶] . . . [¶] I really have a hard problem—hard time getting past that."

When the court reminded Juror No. 1352 that he "can only use information received here in court" and asked again if he could follow that rule, Juror No. 1352 returned to points made in his letter:  "I'm questioning who edited this video though.  Is it the Court?  Is it the prosecution?  Defense?  Police?"  The court replied, "See, you can't be questioning that because there's no evidence about that.  That's the problem.  Now, there might be evidence, and then you could.  But there isn't any evidence.  [¶]  Do you see the problem?"  Instead of directly answering the court's question, Juror No. 1352 returned to his earlier analogy of being told an oil painting was a photograph and advised that the distinction in his mind was "fundamental." Under further questioning from the court, Juror No. 1352 explained that in view of his experience—"I'm in the top one percent of how video is stored and produced"—it was "so fundamental" that the video is "not the pure evidence that is being presented.  It's not pure.  Someone's doctored it."

8

In response to defense counsel's query about whether Juror No. 1352 could follow the law if no evidence was presented showing the video had been altered, Juror No. 1352 stated: "Oh, this is a hard question. I want to say I will follow the law, certainly." When the trial court immediately asked whether he would in fact follow the law, Juror No. 1352 declined to give a direct answer and returned to his own video-related experience: "It's the word 'skip.' It's like, is that a technological term that means something malfunctioned with ADT's video? Because that would not result in a single skip."

After the colloquy with Juror No. 1352, the trial court excused the juror over the defense's objection. The court explained that its decision was based on Juror No. 1352's statement he would feel compelled to share his non-evidence-based conclusions about the video's authenticity with the other jurors.[4]

In its closing argument, the prosecution urged the jury to find defendant guilty based on the "incredibly consistent" testimony of the eyewitnesses (Yvette, Jade, Cibrian, and Tavares) and how it was corroborated by the surveillance video. The defense, in its closing argument, did not call into question the video's authenticity; to the contrary, the defense urged the

---

[4]     At one point during its colloquy with counsel following the examination of Juror No. 1352, the trial court expressed an initial concern that the juror needed to be removed because receipt of his note "destroyed the sanctity of the jury deliberations." After further discussion, the court agreed "completely" with defense counsel that the sanctity of jury deliberations had not been violated because "[d]eliberations haven't started."

jury to "[g]ive [the video] the time that it deserves." Instead, drawing on the defense expert's testimony about how people reconstruct events, the defense argued the incomplete surveillance video "unintentionally contaminated" Yvette and Jade's memories of the shooting. The defense also argued that neither Cibrian's nor Tavares's testimony was credible.

### 2. *Applicable law*

"Under section 1089, a trial court may discharge a juror any time during trial, . . . if the court concludes the juror in question is 'unable to perform his or her duty.'" (*People v. McGhee* (2025) 17 Cal.5th 612, 627.) One ground for discharge is bias, an issue which turns on "whether the juror's judgment or beliefs about an issue are untethered to the facts presented at trial. . . . The question is not simply whether a juror's views derive from a personal leaning or inclination for or against one side, but rather whether the juror's views and conclusions are based on specific evidence presented in the case." (*Id.* at 636.)

"It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. . . . A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources." (*In re Malone* (1996) 12 Cal.4th 935, 963; accord, *People v. Steele* (2002) 27 Cal.4th 1230, 1266 ["[a] fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct"]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 650 [holding a juror may not

discuss new facts that offer other jurors "any basis for deciding the case other than the evidence and testimony presented at trial"].)

McDonald v. Southern Pacific Transp. Co. (1999) 71 Cal.App.4th 256 illustrates how these principles apply. In that case, a juror offered an opinion during deliberations, based on his expertise as a professional transportation consultant, that crossing arms or gates were not placed at the location of the train tracks where the plaintiff was injured because the sensors on the arms would have reacted negatively to other adjacent trains in the railyard. (Id. at 262.) The Court of Appeal found that the juror had committed misconduct because he "went far beyond the evidence in the case," his "comments to the jury, in the nature of an expert opinion," interjected a subject "on which there had been no evidence at trial," and contradicted the testimony of the defendant's own expert on the feasibility of using crossing arms or gates at that location. (Id. at 263-264; see also Nodal v. CalWest Rain, Inc. (2019) 37 Cal.App.5th 607, 611-612 [misconduct where, contrary to the evidence admitted at trial, the juror "vouched for the design and construction" of the defendant's irrigation system "based on his expertise as a pipefitter and farmer"]; San Nicolas, supra, 34 Cal.4th at 648-650 [a juror, who was a registered nurse, did not commit misconduct when she relied on her professional expertise to explain a number of medical concepts relating to blood pressure and circulation during deliberation because her remarks were "consistent with the trial testimony of the pathologist"].)

### 3.    *Standard of review*

A trial court's decision to discharge a juror pursuant to section 1089 is reviewed for abuse of discretion under a "'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.'" (*People v. Armstrong* (2016) 1 Cal.5th 432, 450.)  "[T]he juror's 'inability to perform' his or her duty 'must appear in the record as a demonstrable reality.'" (*Ibid*.)  This standard is "'more comprehensive and less deferential'" than the substantial evidence standard of review.  (*Ibid*.)  Instead of examining the record to determine whether there was reasonable, credible evidence of solid value upon which the trial court could have relied, we look at the evidence upon which the trial court actually did rely to determine whether it supports the trial court's conclusion in light of the entire record.  (*Id*. at 450-451; accord, *McGhee*, *supra*, 17 Cal.5th at 637.)

### 4.    *Juror No. 1352 was correctly excused*

The trial court's decision to discharge Juror No. 1352 was based on the juror's written and oral statements to the trial court.  Those forthright statements—including the view he had formed that the surveillance video footage had been "doctored"—establish as a demonstrable reality that the juror would not be able to render a verdict based solely on the evidence presented.

In his typed note and during his extended colloquy with the court, Juror No. 1352 expressed a firm belief that the video as presented at trial was "not pure" and that it was "obviously more than one clip" spliced together.  In his opinion, the video had been "edited" or "doctored" by someone, either the court or one of the

12

parties. Juror No. 1352 expressed these beliefs even though at that point in the trial there had been no evidence or argument to that effect (nor would there be evidence or argument to that effect throughout the remainder of the trial).

Moreover, Juror No. 1352 based his beliefs solely on specialized information obtained from outside sources: his asserted technical training and experience. In his answers to questions from both the court and defense counsel, Juror No. 1352 steadfastly refused to say unequivocally that he would follow the law and rely only on the evidence presented. Juror No. 1352 also stated he would feel compelled to share his opinions with his fellow jurors regardless of the state of the evidence, because in his mind the footage was not an unaltered video but something else entirely—an "oil painting," to borrow from his analogy. In light of Juror No. 1352's statements, the trial court did not err in dismissing him from jury service.

> B.     *The Trial Court Had No Duty to Instruct on Heat of Passion Voluntary Manslaughter*
> 1.     *Additional background*

Toward the end of trial, the court asked defense counsel if she intended to ask for jury instructions on any lesser included offenses. Defense counsel advised she wanted the court to instruct the jury on heat of passion voluntary manslaughter as a lesser included offense to murder. The prosecution objected and maintained there was no evidence to support such an instruction (Cabrera's act of throwing a small pet gate that did not hit anyone, in the prosecution's view, could not constitute provocation giving rise to a heat of passion). Defense counsel countered that whether Cabrera's act of throwing the pet gate

13

constituted provocation was a "question for the jury." The court took the issue under submission and ultimately ruled a heat of passion voluntary manslaughter instruction was not warranted because defendant and his accomplices were the initial aggressors.

### 2. *Applicable law and standard of review*

A trial court has a sua sponte duty to instruct the jury on a lesser included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162, disapproved on other grounds by *People v. Schuller* (2023) 15 Cal.5th 237, 254-260 & fn. 7; see also *Breverman*, *supra,* at 154 [trial court must provide "'instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged'"].)  "This substantial evidence requirement is not satisfied by "'any evidence . . . no matter how weak,'" but rather by evidence from which a jury composed of reasonable persons could conclude 'that the lesser offense, but not the greater, was committed.'" *(People v. Avila* (2009) 46 Cal.4th 680, 705; accord *People v. Landry* (2016) 2 Cal.5th 52, 96.)  We independently review a claim the trial court erred by failing to instruct on a lesser included offense, and we view the evidence in the light most favorable to the defendant.  (*People v. Licas* (2007) 41 Cal.4th 362, 366; *People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

14

### 3. There was no substantial evidence of heat of passion manslaughter's subjective element

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Voluntary '[m]anslaughter, a lesser included offense of murder, is an unlawful killing without malice. . . . Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense.'" (*People v. Soto* (2018) 4 Cal.5th 968, 974.) "The heat of passion requirement for manslaughter has both an objective and a subjective component." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252; accord, *People v. Moye* (2009) 47 Cal.4th 537, 549.)

""To satisfy the objective or 'reasonable person' element of th[e heat of passion] form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'"" (*Moye, supra*, 47 Cal.4th at 549.) "'The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.'" (*Id.* at 550; accord, *People v. Beltran* (2013) 56 Cal.4th 935, 949-950 ["To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection"].) In other words, the test is whether "an average, sober person would be so inflamed that he or she would lose reason and judgment." (*People v. Lee* (1999) 20 Cal.4th 47, 60.)

To prove the subjective element of heat of passion voluntary manslaughter, the defendant him or herself "must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye, supra*, 47 Cal.4th

15

at 550; accord, *People v. Nelson* (2016) 1 Cal.5th 513, 539.)  "No specific type of provocation is required, and 'the passion aroused need not be anger or rage, but can be any ""'[v]iolent, intense, high-wrought or enthusiastic emotion"'"' [citations] other than revenge.'"  (*People v. Lasko* (2000) 23 Cal.4th 101, 108; see also *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 ["voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words, a technical battery, or slight touching"]; *People v. Wells* (1938) 10 Cal.2d 610, 623 ['"A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter"'].)

Defendant maintains Cabrera's act of tossing the small plastic pet gate in his direction suffices as a legally adequate provocation.  Even if he were right that this act (which occurred only after one in defendant's group threw a punch at Cabrera) was so provocative that it would cause *a reasonable person* to lose reason and judgment, there is still no substantial evidence of the requisite subjective element: that *defendant himself* was then under the influence of any intense emotion at the time of the killing.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 585.)  Defendant did not testify at trial and there was no other evidence regarding his state of mind other than Yvette's testimony that defendant said nothing on the night of the shooting.  A heat of passion instruction is not required where, as here, "the only evidence of [heat of passion] is the circumstance that a defendant

16

is attacked and consequently fears for his life."[5]  (*Moye, supra*, 47 Cal.4th at 555.)


DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.

We concur:



MOOR, J.                                        KIM (D.), J.

---

[5]     Because there was no substantial evidence of the subjective element of heat of passion manslaughter, we need not analyze whether a heat of passion instruction also would have been unwarranted because it would have been inconsistent with the principal theory of the defense, i.e., mistaken identity.  (See, e.g., *People v. Nguyen* (2015) 61 Cal.4th 1015, 1052 ["'A trial court's duty to instruct, sua sponte, on particular defenses arises "'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case'"'"].)